No. 4 February 20, 2015 691

IN THE SUPREME COURT OF THE
STATE OF OREGON

In re Complaint as to the Conduct of
BARNES H. ELLIS,
*Accused.*
(OSB No. 09-54; SC S061385)

In re Complaint as to the Conduct of
LOIS O. ROSENBAUM,
*Accused.*
(OSB No. 09-55; SC S061385)

On review of the decision of the trial panel of the Disciplinary Board.*

Argued and submitted March 4, 2014, at Lewis and Clark Law School, Portland, Oregon.

W. Michael Gillette, Schwabe Williamson & Wyatt PC, Portland, argued the cause and filed the briefs for the Accuseds.

Mary A. Cooper, Assistant Disciplinary Counsel, Tigard, argued the cause and filed the brief for the Oregon State Bar.

Before Balmer, Chief Justice, and Walters, Linder, Landau, Brewer, and Baldwin, Justices.**

PER CURIAM

The amended complaints are dismissed.

_____
\* Trial Panel Opinion May 7, 2013.

\*\* Kistler, J., did not participate in the consideration or decision of this case.

## PER CURIAM

This lawyer disciplinary proceeding involves several allegations under the former Code of Professional Responsibility.[1] The accuseds (also individually referred to as Ellis or Rosenbaum in this opinion) represented a public company involved in various protracted proceedings over several years and also represented some company directors, officers, and managers during some of those same proceedings. The Bar charged the accuseds in separate complaints with multiple violations of several former Disciplinary Rules, including *former* DR 5-105(C) (waivable former-client conflicts with insufficient disclosure); *former* DR 5-105(E) (nonwaivable current-client conflicts and waivable current-client conflicts with insufficient disclosure); and *former* DR 1-102(A)(3) (misrepresentation by omission). A trial panel of the Disciplinary Board concluded that, although the Bar had not proved most of the charged violations, it did sufficiently prove that some client conflicts of interest had existed, that the accuseds had made insufficient disclosures as to those conflicts, and that the accuseds had made related misrepresentations by omission in a particular conflict disclosure letter. The panel determined that a public reprimand was the appropriate sanction. The accuseds sought review as to all allegations that the panel determined that the Bar had proved, and the Bar sought review as to some additional allegations that the panel determined had not been proved. For the reasons explained below, we dismiss the amended complaints.

## I.  FACTS

We review the record *de novo*. Bar Rule of Procedure (BR) 10.6. The Bar must prove its allegations by clear and convincing evidence. BR 5.2. "Clear and convincing evidence" means that "the truth of the facts asserted is highly probable." *In re Phinney*, 354 Or 329, 330, 311 P3d 517 (2013) (internal quotation marks omitted). We set out a general factual summary below and discuss later in this opinion additional facts that relate to particular issues on review. We

---

[1] The Oregon Rules of Professional Conduct replaced the former Oregon Code of Professional Responsibility effective January 1, 2005. *In re Balocca*, 342 Or 279, 281 n 1, 151 P3d 154 (2007).

draw all facts from the testimony and record before the trial panel, and from public court records in related proceedings.[2]

## A.  *Company Background, Accounting Issues, and Class Action Litigation*

FLIR Systems, Inc. (FLIR) is a publicly traded Portland, Oregon, company that manufactures and sells thermal imaging equipment and broadcast camera systems, including to governmental entities. In early 2000, key FLIR directors, officers, and managers included Daltry (Board of Directors Chair), Wynne (board member), Stringer (President and Chief Executive Officer (CEO)), Samper (Chief Financial Officer (CFO)), Martin (Vice President of Sales (Worldwide)), Fitzhenry (General Counsel), and Eagleburger (Director of Sales Operations and Senior Vice President for Sales and Marketing). As CFO, Samper was responsible for FLIR's accounting and preparation of its financial statements.

As the 1990s ended, FLIR's corporate accounting grew more complicated, in part due to recent mergers and acquisitions, and installation of a new enterprise reporting system. In 1999, FLIR had difficulty completing its financial statements on time. At a February 2000 Board of Directors meeting, Samper reported that FLIR's financial statements again would not be prepared on time. By that point, at least some board members began to doubt the competency of management, including Samper's ability to serve as CFO. Samper resigned shortly thereafter.

FLIR then discovered several accounting errors, including improperly claimed revenue in 1998 and 1999 for several transactions that appeared to be without sufficient foundation.[3] As a result of that review, FLIR decided

---

[2] We take judicial notice of additional facts drawn from judicial opinions and court dockets in a related criminal case prosecuted in the United States District Court, District of Oregon, and appealed to the Ninth Circuit. *See In re Fitzhenry*, 343 Or 86, 109 n 17, 162 P3d 260 (2007) (taking judicial notice of fact in public record).

[3] In general, the accounting issues concerned FLIR's "revenue recognition" practices—that is, the point in time at which FLIR could confirm with certainty that it could include revenue derived from a particular transaction in its financial statements. Several transactions later identified as problematic had involved revenue recognized either prematurely or without sufficient supporting documentation.

to restate certain 1998 and 1999 financial statements previously filed with the Securities and Exchange Commission (SEC). In doing so, FLIR's independent auditor instructed FLIR to apply retroactively to the past 1998 and 1999 transactions a new SEC directive, which dictated a delay as to when certain revenue could be recognized in a company's financial statements. The underlying restatement calculations, combined with retroactive application of the new directive, ultimately caused a notable drop in FLIR's reported revenue for the identified time frame.

FLIR publicly announced its intent to restate. FLIR's stock price dropped, and, in early March 2000, several shareholders filed class action securities litigation against FLIR, Stringer, Samper, and eventually Daltry.

Later in March 2000, FLIR retained the accuseds, both partners at Stoel Rives LLP, in the class action litigation, and it informed Stringer and Samper that it would pay for their representation by the accuseds or other counsel. The accuseds sent engagement letters to FLIR, Stringer, and Samper, stating that a unified defense was advantageous and that they did not anticipate that any conflict would arise, but that each individual defendant might wish to consult with independent counsel for monitoring purposes; the letter also recommended consultation before consenting to the joint representation. Stringer declined and retained outside counsel. Samper already had retained outside counsel, Glade and Kaner, but decided in consulting with them to agree to have the accuseds serve as co-counsel. Glade accepted the joint representation on Samper's behalf, noting that—in the unlikely event that an actual conflict arose—Samper reserved his rights regarding his consent to the accuseds' continued representation of FLIR. After Daltry became a defendant in the class action, he also agreed to the joint representation, and he signed a similar consent letter. Fitzhenry consented on FLIR's behalf. When the accuseds began representing FLIR, Daltry, and Samper in the class action, they understood FLIR's accounting issues to be the result of possible management competency issues and an overworked and underesourced accounting staff, but not fraudulent actions by any FLIR officer or manager.

FLIR ultimately filed three SEC restatements between April 2000 and March 2001. The class action litigation eventually settled in April 2001, before discovery, with payment by both FLIR's insurer and FLIR. No allegations in this proceeding concern the class action litigation.

At about the time that FLIR retained the accuseds, FLIR's board appointed a special committee, which included Wynne, to examine more closely the 1998 and 1999 financial misstatements and underlying accounting problems. In working with a prospective new independent auditor, the committee determined that it should assess the integrity of current management, which at that time included Daltry and Stringer (but not Samper, who had resigned, although the board had approved retaining him as an independent consultant to assist with the restatements). The committee determined that Stringer had engaged in misrepresentations, and the board later decided that he should resign. Stringer was placed on administrative leave in May 2000 and later terminated; Daltry also resigned. By then, Wynne had come to question Stringer's integrity, but not Samper's; instead, he continued to view Samper as having competency issues only, and he did not think at this time that FLIR's management had engaged in any fraud.

B.  *SEC Investigation*

Meanwhile, the SEC had begun investigating FLIR's accounting, arising from the same general facts and issues alleged in the class actions. The SEC began issuing subpoenas to FLIR officers, managers, and employees in late June 2000. At FLIR's request, the accuseds' joint representation—initially formed for the class action litigation—expanded to include any current or former FLIR officer, manager, or employee who received an SEC subpoena and who consented to be included in the joint representation. The accuseds continued their joint representation of FLIR, Daltry (for purposes of his SEC interview only), and Samper (who also continued to be separately represented by Glade and Kaner); they also began representing Wynne, Fitzhenry, and Eagleburger for purposes of the SEC investigation. The accuseds ultimately represented about 35 to 40

individuals, slightly more than half the witnesses that the SEC examined.

Although the accuseds represented many individuals in the SEC investigation, they sent only eight engagement letters, directed to the individual clients who they thought had the greatest potential for future possible conflicts, including members of the board, Daltry, and Eagleburger. Those letters requested consent to the joint representation by using similar wording as the earlier class action letters; they did not include any new wording relating to the SEC investigation. The accuseds did not send a letter to Samper, because he only recently had signed a similar letter in the class action involving the same facts. For his part, Glade did not necessarily expect the accuseds to send a separate engagement letter to Samper, because he assumed that the SEC representation would proceed in the same fashion as the class action litigation—that is, he and Kaner would remain knowledgeable so as to provide independent advice to Samper and be available to take over responsibility for him as necessary.[4] The accuseds agreed with each other to watch for emerging conflicts between their clients.

The joint representation strategy in the SEC investigation was purposeful. According to the testimony of several witnesses before the trial panel, rules governing SEC investigations limit information available to subject companies and witnesses, while maximizing the SEC's ability to acquire information. A lawyer is permitted to attend a witness interview only if representing the witness, and the ability to examine transcripts and exhibits shown to witnesses during interviews is similarly limited. Joint representation therefore permits the company's attorneys to act as a central clearinghouse to obtain, consolidate, and disseminate material information—such as subpoenaed documents and the content of other witness interviews—to the joint clients, so as to maximize the amount of information flowing to all represented individuals. That global collection of information, in turn, helps the company and all involved individuals to

---

[4] The evidence conflicts as to whether the accuseds sent a separate SEC engagement letter to Fitzhenry. Rosenbaum thought that they had sent him such a letter, but Ellis recalled that they had not, because they had no expectation that the SEC investigation posed any risk to him.

clarify the nature and focus of the investigation, and to provide useful information to the SEC. Also, unless the nature of the investigation lends itself to blame-shifting—such as cases involving insider trading, embezzlement, or obstruction of justice—the interests of the company and the various witnesses tend to be aligned during the investigation phase, because both the company and the witnesses seek to provide the SEC with truthful information so as to understand more fully the scope and direction of the investigation, and to ameliorate the need for any continued investigation. Joint representation therefore is a common practice during the SEC investigation phase, when appropriate under the circumstances. As part of a joint representation, it also is common for some individual witnesses to have their own, independent lawyers, who monitor the proceedings to evaluate whether any conflict arises and who later may serve as lead counsel for their clients if needed.

During the SEC investigation, subpoenaed witnesses typically sent requested documents to Fitzhenry, and he sent them to the accuseds. The accuseds maintained all the documents in a room at Stoel Rives in part for SEC staff review; if SEC staff then marked a document for production, Stoel Rives would catalogue the document in a FLIR database and produce it to the SEC. Also as part of the joint representation, either Ellis or, more often, Rosenbaum attended all their clients' SEC interviews. Rosenbaum took extensive notes during the interviews that she attended, and she provided to individual witness clients or the lawyers of represented witness clients written summaries of all information that she learned during the interviews that was relevant to that client. The accuseds also provided several interview transcripts to their individual clients or their lawyers.

Part of the SEC's investigation explored Samper's involvement, as CFO, in FLIR's accounting problems that had prompted the restatements. Either Glade and Rosenbaum or Kaner and Rosenbaum attended all Samper's SEC interviews, and Rosenbaum provided to Glade and Kaner comprehensive written summaries of all other witness testimony and other documentation that, in her judgment, was

material to Samper's involvement.[5] The accuseds, Glade, and Kaner continuously conferred through the course of the SEC investigation regarding the transactions at issue and the SEC's inquiries touching on Samper. For example, early in the investigation, a FLIR employee, Chambers, stated that Samper had directed the destruction of a document that she had created to track inventory. Rosenbaum, Glade, and Kaner thereafter provided information to the SEC, through Samper, showing that Chambers did not have a full understanding of the situation and that the destruction request had been appropriate. By the later part of 2001, Glade and Kaner continued to think that Samper did not have any conflicting interest with FLIR of which the accuseds would have been aware,[6] and they continued to think that Samper's and FLIR's interests aligned.

The SEC focused on numerous specific transactions during its investigation, including a $4.6 million 1999 transaction—the "Swedish Drop Shipment"—that had prompted FLIR's second SEC restatement. Samper had mentioned that transaction to the SEC, and the SEC questioned both Samper and Stringer about its underlying entries. Samper told the SEC that Stringer had directed him to make certain entries and therefore he had done so, but FLIR later changed those entries in its second restatement.

Also during the SEC interviews, several of the accuseds' individual clients offered statements that arguably could be construed as unfavorable to other clients, particularly Samper. The accuseds continued to evaluate whether any conflict among various clients had arisen, but they determined that their clients' interests remained

---

[5] The record shows that Rosenbaum sent Glade and Kaner a significant volume of documentation and also provided their law firm with a copy of Stoel Rives's FLIR database.

[6] Samper and FLIR had a dispute about the terms of an earlier agreement between them, concerning Samper's exercise of stock options following termination of employment. That dispute prompted Samper to think that his relationship with FLIR was becoming more adverse through the course of the SEC investigation. The accuseds were not aware of that issue, however; indeed, Glade testified that he did not involve Rosenbaum in any options dispute discussion because he did not want to taint her relationship with Samper or FLIR for purposes of the SEC investigation. Glade further testified that Samper ultimately decided to continue the joint representation notwithstanding the options dispute.

aligned and therefore made no additional disclosures during the investigation phase.[7]

As the SEC investigation progressed, Wynne worked with a new FLIR controller, Muessle, who had reviewed multiple earlier recorded transactions and determined that many should not have been entered due to insufficient supporting documentation. By spring 2001, Wynne concluded that FLIR's former management had engaged in securities fraud. As to Samper specifically, Wynne concluded that Samper had made entries and submitted financial statements that contained figures manipulated as a result of fraud, which, in Wynne's view, satisfied the definition of securities fraud, even if Samper himself had not manipulated any figures. The accuseds were unaware until several years later that Wynne had reached that general conclusion about Samper.

Meanwhile, in July 2001, Stringer sued FLIR for wrongful termination, and the accuseds' firm, Stoel Rives, represented FLIR in that action. The complaint eventually was dismissed with prejudice in 2003.

The SEC investigation effectively concluded near the end of 2001. Typically, at the close of an SEC investigation phase, the SEC decides whether to send a "Wells Notice" to the company or other individuals. A Wells Notice is an official notification that outlines the SEC's potential case against the recipient, laying the groundwork for a possible civil enforcement action. During the "Wells phase," each Wells Notice recipient typically meets separately with the SEC to discuss the SEC's theory of its case against that recipient. A Wells Notice recipient then may file a "Wells Submission" that offers a specific response to the Wells Notice. Often, the Wells process frames ensuing settlement negotiations between the SEC and a Wells Notice recipient.

---

[7] The SEC interviewed many other witnesses who were not the accuseds' clients, including Stringer, a previous FLIR controller, the previous and current FLIR auditors, and a previous FLIR Vice President of Manufacturing, who some inside FLIR suspected had initiated the SEC investigation. More than half the SEC's interview time in its investigation was devoted to witnesses who were not the accuseds' clients. Under the SEC's investigation rules, the accuseds were not privy to any information provided by witnesses whom they did not represent and therefore did not know the extent to which those witnesses might have testified unfavorably as to Samper or their other clients.

In February 2002, the SEC issued Wells Notices to FLIR and Samper, indicating its intention to recommend separate civil enforcement actions against them. The SEC also issued similar Wells Notices to Fitzhenry and Eagleburger,[8] which the accuseds had not anticipated, and to others who were not the accuseds' clients, including Stringer; Martin (FLIR's former Vice President of Sales (Worldwide), who effectively had been terminated in spring 2000); and FLIR's previous auditor. Ellis immediately advised Fitzhenry and Eagleburger to obtain independent counsel, and they both did so. Wilson began representing Fitzhenry, and Neil began representing Eagleburger; as to both clients, the accuseds remained available as supporting co-counsel. As to Samper, Glade and Kaner took the lead in his representation during the Wells phase, with the accuseds moving to a supporting co-counsel role as needed. The accuseds continued to represent FLIR.

In early March 2002, FLIR had its Wells meeting with the SEC, which included Wynne, the accuseds, and FLIR's then-current CEO, Lewis. At that meeting, FLIR emphasized its remediation efforts. Also at the meeting, SEC staff questioned both Samper's and Fitzhenry's truthfulness, based on their investigation. After the meeting, Rosenbaum reported the general discussion to Glade and Kaner, and also to Neil, once he began representing Eagleburger. Among other things, Rosenbaum told Kaner that the SEC thought that Samper had not been forthcoming.

Samper's Wells meeting was scheduled for the following week. Before that meeting, Ellis left a long voicemail message for Glade that emphasized the SEC's strident tone in FLIR's Wells meeting; emphasized the SEC's certitude that wrongdoing had occurred, including by Samper; and recommended possible approaches for Samper. Glade and Kaner—but not the accuseds—attended Samper's Wells meeting. Even with Ellis's forewarning, they were shocked by the SEC's tone and negative view of Samper. In the course of discussing its case against Samper, the SEC told Glade and Kaner that Rosenbaum had represented most of

---

[8] The SEC issued Eagleburger's Wells Notice in mid-March 2002, after FLIR filed its Wells Submission, as described later in the text.

the witnesses who purportedly had implicated Samper in problematic transactions.

Rosenbaum was out of the country during Samper's Wells meeting, but she e-mailed Glade afterwards to ask how it had gone. Glade responded that it was "what you would expect" and had involved familiar transactions, that the SEC was relying on FLIR employees who did not have first-hand knowledge of key events, and that the SEC thought that Samper had been disingenuous at best. Rosenbaum and Glade then exchanged thoughts about Samper preparing a Wells Submission; Glade's side of the communication acknowledged that Rosenbaum had been supplying him with her witness notes all along, suggesting that he already had been privy to statements about Samper from Stoel Rives-represented witnesses on which the SEC had relied in Samper's Wells meeting.

The accuseds, Wynne, and Fitzhenry drafted FLIR's Wells Submission, filed in March 2002. FLIR's Wells Submission purposefully focused on current management's remediation efforts since discovery of the 1998 and 1999 accounting issues. FLIR emphasized a near-complete turnover of management and auditors, and its expansion and strengthening of its accounting personnel and controls, including removal of senior management responsible for FLIR's troubles. FLIR described the earlier accounting issues as "errors" or "problems," not "fraud." FLIR also stated that, to the extent that any wrongdoing might have occurred, FLIR understood that the SEC was "pursuing fraud claims against one or more individuals who may have been responsible." In crafting its Wells Submission, FLIR intended to refer to only Stringer and Martin as the senior management who had been "removed" and against whom the SEC was "pursuing" further action. FLIR's Wells Submission did not expressly take any position or make any characterization about Samper, Daltry, or Eagleburger, although it did comment favorably on Samper's cooperation with the SEC; it also included an expressly favorable statement about Fitzhenry, who was the only member of the current senior management team who had worked at FLIR in 1998 and 1999, and so the drafters thought it important to offer a positive comment about his ongoing employment.

At the time that FLIR prepared its Wells Submission, the accuseds had concluded that Stringer and Martin—but not Samper or any of their other clients—had acted fraudulently in relation to FLIR's 1998 and 1999 accounting errors.

Upon receipt of FLIR's Wells Submission, Glade reviewed it and construed it as inferentially referring to Samper as a bad actor. Ellis, however, assured Glade that FLIR had not intended to identify Samper as a culpable actor; instead, FLIR's Wells Submission focused on forward-looking remediation only. Glade and Kaner continued to represent Samper through the Wells phase, with the accuseds continuing as supporting co-counsel, communicating almost daily with Glade and Kaner. Samper ultimately did not file a Wells Submission.

Fitzhenry and Eagleburger also each had Wells meetings with the SEC, attended by their respective independent counsel and Ellis. Ellis worked on a draft Wells Submission for Eagleburger at Neil's request.

Individual negotiations with the SEC commenced thereafter, resulting in separate settlement orders, finalized in judgment form by October 2, 2002, between the SEC and FLIR, Samper, and Eagleburger; an order as to Fitzhenry issued later, in November 2002.[9] The accuseds represented

---

[9] Among other things, the SEC's judgment against FLIR set out several SEC findings of fraud—which FLIR neither admitted nor denied—relating to FLIR's revenue recognition practices and other accounting and related activities. The order included a "cease and desist" provision, respecting future violations of federal securities law, and, because of the fraud findings, it also removed for a five-year period FLIR's "safe harbor" protection under federal securities law. (Witnesses testified that, when in place and when predicate conditions are met, the "safe harbor" protection shields a public company from legal actions based on incorrect financial projections.) As a result of its SEC judgment, FLIR also was later required to defend against a costly debarment proceeding, which—had debarment been ordered—would have prohibited FLIR from selling its products to the federal government, a key customer.

The SEC's judgment against Samper permanently enjoined him from engaging in several particular actions in violation of federal securities law; imposed a civil penalty of $110,000 and a disgorgement order of $52,500 plus interest; and permanently prohibited him from serving as an officer or director of a company that issued securities or was required to file SEC reports. The SEC's judgment against Eagleburger contained several injunction provisions similar to the judgment against Samper and imposed a civil penalty of $25,000. The SEC order against Fitzhenry precluded him from practicing before the SEC for five

FLIR in its negotiations, but did not participate in negotiations involving the three individual clients, who instead continued to be represented by their respective independent counsel. Following finalization of the SEC settlements, the accuseds considered their representation of Samper, Fitzhenry, and Eagleburger—and of Daltry, who had not received a Wells Notice—to be at an end. Stringer did not settle with the SEC, and the SEC later filed a complaint against him.

In the same general timeframe as the SEC Wells process and settlements, FLIR continued to defend against Stringer's wrongful termination action. Wynne, who by now had replaced Fitzhenry as FLIR's General Counsel, determined that the SEC's open Stringer investigation might be helpful to FLIR in defending against his wrongful termination action. After the SEC settlements against FLIR and Samper had been finalized, Wynne reviewed the SEC's complaint against Stringer and was surprised that it did not include any allegation about the Swedish Drop Shipment entry, which Wynne thought was the most egregious example of financial irregularity tied directly to Stringer. Wynne also thought that that entry—which never had identified either an underlying transaction or product—was critical to FLIR's defense against Stringer's pending wrongful termination action because it tended to justify Stringer's termination. Wynne therefore asked Rosenbaum, in her capacity as FLIR's counsel, to contact the SEC and inquire about the absence of that entry from the SEC's complaint against Stringer. At that time, Rosenbaum considered her representation of all the joint representation clients other than FLIR to be over; also, both she and Ellis thought that the Swedish Drop Shipment entry implicated Stringer, but not Samper, who no longer had a pending action before the SEC. Rosenbaum called the SEC on October 3, 2002, conveying Wynne's offer that FLIR would assist the SEC in its case against Stringer and noting Wynne's surprise that the SEC's complaint against Stringer did not mention the Swedish Drop Shipment.

years. The settlements with all three individual clients incorporated consents to entry of judgment or order, in which the clients neither admitted nor denied the allegations in the SEC complaints against them.

## C.  *Fitzhenry's Bar Matter*

Also in October 2002, Fitzhenry asked Ellis to self-report to the Bar on Fitzhenry's behalf, regarding an acknowledgment in Fitzhenry's Wells Submission and SEC settlement order that he had signed an inaccurate management representation letter in 1999, in reliance on prior signatures from Stringer, Samper, and others.[10] Ellis notified the Bar and sent a confirming letter in November 2002, explaining that Fitzhenry by his signature had intended to verify only the legal—not accounting—representations made in the management representation letter and that he otherwise had relied on FLIR's CEO (Stringer), CFO (Samper), and outside auditors for verification that a particular sale referred to in the letter could be recorded and that the accounting representations were therefore accurate. The next month, Ellis sent the Bar additional materials and a longer letter that, among other things, reiterated that Samper, as CFO and also a signatory on the letter, was a person directly responsible for accounting issues at FLIR and that Samper had assured Fitzhenry that the representations in the letter were accurate. The Bar filed a complaint against Fitzhenry in November 2003, and Ellis thereafter represented him in his Bar matter. This court ultimately suspended Fitzhenry for 120 days, for violating *former* DR 1-102(A)(3) (conduct involving misrepresentation). *In re Fitzhenry*, 343 Or 86, 162 P3d 260 (2007).

## D.  *Department of Justice Investigation*

In January 2003, an Assistant United States Attorney, Garten, told Ellis that the Department of Justice (DOJ) was opening a criminal investigation into FLIR's accounting. None of the involved lawyers who testified at the trial panel hearing—including the accuseds—had anticipated a criminal investigation, and they all were surprised to learn about it.[11] Over the next several weeks, Garten and

---

[10] The letter was a negative assurance letter to FLIR's independent auditor, intended to represent that its contents—which concerned several transactions— were accurate to the best of each signatory's belief. Daltry, Stringer, Samper, and others had signed the letter before Fitzhenry.

[11] According to testimony in the record, in the early 2000s, if the DOJ became interested in the target of an SEC investigation, then the SEC investigation typically would be stayed and the DOJ would commence its own investigation. That

the accuseds either met or communicated several times, and the accuseds produced FLIR documents to the DOJ or the FBI at Garten's request. As discussed below and later in this opinion, the nature of the conversations and extent of the document production underlie some of the Bar's conflict of interest and misrepresentation allegations.

Garten initially told the accuseds that he did not intend to target FLIR, but he pressed for both FLIR and the accuseds personally to cooperate with the DOJ in building a case against all potential defendants. In a subsequent meeting that Ellis attended, Lewis assured Garten that FLIR would cooperate, but the accuseds did not think that they ethically could assist in a case against their former clients.

Garten later wrote to the accuseds and reiterated his request that they cooperate; his letter also suggested that FLIR had requested immunity.[12] Garten eventually withdrew his request for the accuseds' personal cooperation, although he continued to request assistance with document production and witness scheduling. Garten also told the accuseds in his last meeting with them that, as to Daltry and Fitzhenry but not Samper, he might not pursue individual criminal cases if they cooperated. Garten later sent a confirming e-mail that continued to request the accuseds' assistance in witness scheduling and reiterated an earlier document request. Thereafter, the accuseds had no direct contact with Garten other than document production—which by this time was ongoing—and witness scheduling.

On the same day as the accuseds' last meeting with Garten, Rosenbaum told Glade—and later confirmed in writing—that FLIR was not a DOJ target and that Samper

practice began to change after the Enron scandal that began in 2001, with its ensuing criminal prosecutions that continued for years afterward. Here, unbeknownst to the accuseds and other participants in the SEC proceeding, the SEC and the DOJ had been communicating about the FLIR investigation since summer 2000.

As to Samper specifically, the accuseds, Glade, and Kaner all thought throughout the SEC investigation that Samper had not acted fraudulently and did not think at the time of Samper's SEC settlement that he would need a criminal attorney.

[12] As explained later in this opinion, other evidence in the record—including testimony from various witnesses and a subsequent declaration from Garten—showed that the DOJ did not make any immunity arrangement with FLIR.

and others, including Daltry, Fitzhenry, and Eagleburger, might need lawyers in connection with the DOJ investigation. Her confirming letter to Glade also stated that the accuseds expected to continue to assist FLIR with document production and witness scheduling. Rosenbaum sent a similar letter to Eagleburger's independent counsel, Neil. Rosenbaum also eventually reached Daltry; on her recommendation, Daltry immediately retained criminal defense counsel, Myers. Rosenbaum told Myers about Garten's document requests, that FLIR was not a DOJ target, and that Garten was inclined to give Daltry immunity if he cooperated; Ellis reiterated several of those points to Myers the next day. By about this time, Stoel Rives had sent numerous FLIR documents to either the DOJ or the FBI—many were part of the public record, and many, but not all, had been produced to the SEC previously.

In late February 2003, after meeting with Garten to reiterate FLIR's intent to cooperate, Wynne proposed to the accuseds that FLIR retain separate counsel as to the DOJ investigation but that the accuseds continue to produce FLIR documents as needed and to schedule witness interviews.[13] The accuseds tentatively agreed and determined that they were not obligated to make any disclosure about the arrangement to Daltry, Samper, or Eagleburger. They nonetheless decided, in the exercise of caution, to send a disclosure letter and obtain consent.

On March 3, 2003, Rosenbaum sent a disclosure letter to FLIR and also, in care of their individual counsel, to Daltry, Samper, and Eagleburger. The letter explained that FLIR was cooperating with the DOJ and did not expect to be a defendant; that Stoel Rives had been asked to advise FLIR and assist in producing documents and scheduling witness interviews; that the investigation related to the accuseds' earlier representations of Daltry, Samper, and Eagleburger, and had potentially adverse consequences to them; and that Stoel Rives would not voluntarily disclose either client confidences or information or materials arguably subject

---

[13] The accuseds characterize that arrangement as "Stoel Rives's ministerial role." We refer to the arrangement as the accuseds' limited representation of FLIR during the DOJ investigation.

to confidentiality claims. The former clients all consented. In the meantime, the accuseds scheduled further witness interviews and had produced more documents to the DOJ. For its part, FLIR retained other counsel to represent it in other aspects of the DOJ investigation.

In September 2003, Stringer, Martin, and Samper were indicted in United States District Court for criminal securities violations. They moved to dismiss, asserting violations of due process and self-incrimination protections stemming from surreptitious cooperation between the SEC and the DOJ. Samper further argued that the government had taken unfair advantage of the accuseds' purported conflict of interest. The District Court agreed with the defendants' arguments and dismissed the indictments in 2006, but the Ninth Circuit vacated the dismissals in 2008.[14] *United States v. Stringer*, 535 F3d 929, 942 (9th Cir 2008). The Ninth Circuit decision brought the case to the Bar's attention. None of the clients or lawyers involved complained to the Bar about the accuseds' conduct.

E.   *Bar Complaints and Trial Panel Hearing and Decision*

The Bar filed amended complaints against the accuseds in February 2012, alleging violations of *former* DR 1-102(A)(3) (misrepresentations by omission) (one cause and one alternative cause as to each); *former* DR 5-105(C) (former-client conflict) (one alternative cause as to each, and one additional cause as to Ellis); and *former* DR 5-105(E) (current-client conflict) (nine causes as to Rosenbaum, and 10 as to Ellis). The amended complaints were identical, except that the complaint against Ellis contained two additional allegations concerning his representation of Fitzhenry in the latter's Bar matter.

The trial panel conducted a hearing in 2012 and concluded in 2013 that the Bar had not proved most of the alleged violations, but had proved some violations, and further determined that the appropriate sanction was a public reprimand. The accuseds requested review of all the panel's conclusions that violations had occurred, and the Bar raised

---

[14] The DOJ eventually moved to dismiss most of its charges against Stringer and Samper, but ultimately obtained one misdemeanor conviction, for receiving stolen money, as to each of them.

additional challenges to several panel conclusions that no violation had occurred. We summarize the panel's decisions at issue on review in our discussion below.

## II.   DISCIPLINARY RULES

As noted, the Bar's complaints alleged misconduct under the former Code of Professional Responsibility.[15] *Former* DR 5-105 set out the client-conflict rules and provided, in part:

"(A)   Conflict of Interest. A conflict of interest may be actual or likely.

"(1)   An 'actual conflict of interest' exists when the lawyer has a duty to contend for something on behalf of one client that the lawyer has a duty to oppose on behalf of another client.

"(2)   A 'likely conflict of interest' exists in all other situations in which the objective personal, business or property interests of the client are adverse. A 'likely conflict of interest' does not include situations in which the only conflict is of a general economic or business nature.

"* * * * *

"(B)   Knowledge of Conflict of Interest. For purposes of determining a lawyer's knowledge of the existence of a conflict of interest, all facts which the lawyer knew, or by the exercise of reasonable care should have known, will be attributed to the lawyer.

"(C)   Former Client Conflicts—Prohibition. Except as permitted by [*former*] DR 5-105(D), a lawyer who has represented a client in a matter shall not subsequently represent another client in the same or a significantly related matter when the interests of the current and former clients are in actual or likely conflict. Matters are significantly related if either:

"(1)   Representation of the present client in the subsequent matter would, or would likely, inflict injury or damage upon the former client in connection with any proceeding, claim, controversy, transaction, investigation, charge,

---

[15] We quote the former disciplinary rules at issue from the 2000 version of the former Code of Professional Responsibility. The text from the 2000 versions of the rules remained the same through 2004, which spans the years of the events at issue in this case.

accusation, arrest or other particular matter in which the lawyer previously represented the former client; or

"(2)   Representation of the former client provided the lawyer with confidences or secrets as defined in [*former*] DR 4-101(A), the use of which would, or would likely, inflict injury or damage upon the former client in the course of the subsequent matter.

"(D)   Former Client Conflicts—Permissive Representation. A lawyer may represent a client in instances otherwise prohibited by [*former*] DR 5-105(C) when both the current client and the former client consent to the representation after full disclosure.

"(E)   Current Client Conflicts—Prohibition. Except as provided in [*former*] DR 5-105(F), a lawyer shall not represent multiple current clients in any matters when such representation would result in an actual or likely conflict.

"(F)   Current Client Conflicts—Permissive Representation. A lawyer may represent multiple current clients in instances otherwise prohibited by [*former*] DR 5-105(E) when such representation would not result in an actual conflict and when each client consents to the multiple representation after full disclosure * * *."

*Former* DR 10-101(B) established the requirements for "full disclosure" under *former* DR 5-105; it provided, in part:

"(1)   'Full disclosure' means an explanation sufficient to apprise the recipient of the potential adverse impact on the recipient, of the matter to which the recipient is asked to consent.

"(2)   As used in * * * [*former*] DR 5-105 * * *, 'full disclosure' shall also include a recommendation that the recipient seek independent legal advice to determine if consent should be given and shall be contemporaneously confirmed in writing."

Finally, *former* DR 1-102(A) provided, in part:

"(A)   It is professional misconduct for a lawyer to:

"* * * * *

"(3)   Engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

Below, we address each of the trial panel's conclusions concerning the rules set out above that are at issue on review. Our discussion is organized in the same chronological order in which the underlying events occurred.

### III. FIRST CAUSE—*FORMER* DR 5-105(E), CURRENT-CLIENT LIKELY CONFLICTS AT OUTSET OF SEC INVESTIGATION

A. *Trial Panel Decision, Parties' Contentions on Review, and General Discussion*

The first cause alleged that the accuseds had violated *former* DR 5-105(E) when they agreed to represent FLIR on the one hand, and Daltry, Samper, Fitzhenry, and Eagleburger on the other, at the outset of the SEC investigation, with insufficient disclosure and consent concerning likely conflicts of interest.[16] The trial panel concluded that no likely conflict of interest existed. The Bar challenges that conclusion on review, arguing in part that the panel incorrectly applied the "actual conflict" standard under *former* DR 5-105(A)(1), instead of the "likely conflict" standard under *former* DR 5-105(A)(2). The Bar contends that, under that latter standard, the interests of FLIR, Daltry, Samper, Fitzhenry, and Eagleburger were adverse because, although they all hoped that the SEC would find no misconduct, they each had an interest in protecting themselves if it did— including, to the extent necessary, identifying and testifying against possible wrongdoers in the group. The Bar continues that the SEC was likely to share its information with other agencies for use in future criminal, disciplinary, or other proceedings, in which Fifth Amendment incrimination implications and professional licenses might have been at stake. The Bar also asserts that any self-protective step that an individual client might have taken during the SEC investigation in turn might have been adverse to FLIR, which had an interest in setting a cooperative tone with the SEC. The Bar then argues that the accuseds' disclosure letters did

---

[16] The complaint alleged additional clients, but we address only those clients whom the Bar has identified on review. Further, throughout this opinion, we have addressed only particular current or former clients and particular issues that— in collective consideration of the complaint allegations, the trial panel's opinion, and the parties' arguments in their briefs—are properly at issue on review.

not satisfy the "full disclosure" requirements under *former* DR 10-101(B), to ensure informed consent to the joint representation, and also that—because they did not send him a letter—no disclosure at all had been made to Samper.[17]

The accuseds disagree that FLIR and the identified individual clients had adverse interests at the outset of the SEC investigation, and they assert that the trial panel therefore correctly determined that no likely conflict of interest existed. The accuseds point to evidence demonstrating—in their view—that the Bar's adversity theories are incorrect and that, instead, their multiple representation strategy in the context of the SEC investigation was a common and widely accepted practice that was both effective and ethical. The accuseds relatedly argue that, even if any likely conflict of interest existed, they disclosed all material information to their clients so as to obtain their informed consent to the joint representation.

The Bar is correct that its first cause focused on "likely" current-client conflicts, rather than "actual" conflicts, at the outset of the SEC investigation. The Bar is also correct that the trial panel nonetheless concluded that no "actual" conflict had existed because the accuseds had no duty at that point in time to contend for a position on behalf of one client that they had a duty to oppose on behalf of another, under *former* DR 5-105(A)(1). However, the panel

---

[17] The complaints refer in the first cause to alleged conflicts arising only "[w]hen [the accuseds] undertook to represent" all the clients in the SEC joint representation and refer in the second cause to further alleged conflicts arising *during* the investigation stage, through the course of witness interviews and ending with the Wells phase. The trial panel concluded that the Bar had not proved the allegations in the first cause, but, in reaching that conclusion, it extensively addressed facts arising *during* the SEC investigation up to the Wells phase, not those in existence at the *outset* of the investigation. In its brief, the Bar identifies both the first and second causes as being at issue on review; however, it—like the panel—primarily treats the first cause as relating to activities during the SEC investigation up to the Wells phase (with some limited argument about conflicts at the outset of the representation) and the second cause as concerning the Wells phase.

Consistently with the amended complaints and the Bar's identification of the causes and issues on review, we consider allegations and arguments about conflicts at the outset of the SEC investigation as part of the first cause, and we then consider the panel's determinations relating to ongoing investigation issues before and during the Wells phase—and the parties' respective arguments about those determinations—as part of the second cause.

also concluded that the interests of FLIR and the individual clients were not "adverse" or in likely conflict during the SEC investigation process—amounting to an effective determination that no such conflict had existed at the outset of the SEC investigation. We proceed to address the Bar's challenge under this cause by determining whether a likely conflict existed.

Under *former* DR 5-105(A)(2), a likely conflict exists when the "objective, personal, business or property interests of the clients are adverse." Concerning a multiple client representation, the specific question under *former* DR 5-105(A)(2) is whether the client interests "*are* adverse" (emphasis added) at the time that the lawyer seeks to undertake the representation, not whether they might be adverse in the future. *See [In re Hostetter](#)*, 348 Or 574, 594, 238 P3d 13 (2010) (so stating; focus is whether respective interests were "adverse from the outset," not whether client injured later as result of a conflict). Indeed, the fact that a conflict develops later does not mean that adversity existed at the outset. *See In re Samuels/Weiner*, 296 Or 224, 230, 674 P2d 1166 (1983) (court rejected Bar's prediction of potential future conflicts in partnership and reliance on ultimate breakdown of partners' relationship to support allegations under earlier version of *former* DR 5-105(A)).

Respecting "adverse" interests, this court has noted under an earlier version of *former* DR 5-105 that a lawyer's independent judgment can be adversely affected when two or more clients "have differing interests, whether such interests be conflicting, inconsistent, diverse, or otherwise discordant."[18] *In re Johnson*, 300 Or 52, 58 n 4, 707 P2d 573 (1985) (internal quotation marks omitted); *see also Webster's Third New Int'l Dictionary* 31 (unabridged ed 2002) (defining "adverse," in part, as "acting against or in a contrary direction: OPPOSING *** : HOSTILE, OPPOSED, ANTAGONISTIC *** **2 a :** in opposition to one's interests : DETRIMENTAL, UNFAVORABLE"). This court has identified many scenarios involving readily identifiable client

---

[18] *Former* DR 5-105(B) (1984) provided that "[a] lawyer shall not continue employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5-105(C)."

interests that are adverse by their nature, such as debtor-creditor relationships, *Hostetter*, 348 Or at 593; spousal and similar relationships with opposing legal interests, *In re Lawrence*, 337 Or 450, 461, 98 P3d 366 (2004) (alleged batterer and victim); *In re Cohen*, 316 Or 657, 661-62, 853 P2d 286 (1993) (spouses with diverging interests in different proceedings—criminal mistreatment case for husband, related juvenile case in which children might be taken from wife); and criminal coconspirators or codefendants, *In re Jeffery*, 321 Or 360, 370-71, 898 P2d 752 (1995); *In re O'Neal*, 297 Or 258, 260-66, 683 P2d 1352 (1984). In those circumstances, the court has explained that the conflicts rules guard against a lawyer's impaired judgment or divided loyalty arising from differing client interests. *See O'Neal*, 297 Or at 264 (lawyer who undertakes multiple client representations involving differing interests must carefully weigh possibility that the lawyer's judgment might be impaired or loyalty divided); *In re Porter*, 283 Or 517, 521-22, 584 P2d 744 (1978) (to same general effect).

By contrast, this court also has explained that the interests of multiple clients might be consistent—and therefore not adverse—at the time that the lawyer seeks to undertake a new representation. In *In re Cobb*, 345 Or 106, 190 P3d 1217 (2008), for example, the accused lawyer represented several investors who were part of investor partnerships in a company involved in questionable tax dealings. The lawyer first represented the investors in "test cases" against Internal Revenue Service (IRS) personnel and later represented the investor partnerships in challenging the disallowance of certain IRS deductions. *Id.* at 110-11. An entity associated with the company later filed Chapter 11 bankruptcy, and the investor partnerships retained the same lawyer to protect their interests—including assets—in that proceeding. *Id.* at 111. Unrelated creditors later forced the entity and the company into Chapter 7 bankruptcy, and the lawyer represented the debtor company in that proceeding for the sole purpose of raising a jurisdictional defense that might have resulted in dismissal of the bankruptcy. *Id.* at 112. The Bar argued that the lawyer had a current-client likely conflict of interest when he represented the investor partnerships in the Chapter 11 proceeding and the company

in the Chapter 7 proceeding, asserting what the Bar contended were adverse positions. This court disagreed, reasoning that the lawyer's assertions in both proceedings were consistent with each other.[19] *Id*. at 133 n 18. The court also explained, in the course of rejecting a related conflicts argument on the Bar's part, that the interests of the investor partnerships and the company were not those of creditor-debtor at the time in question. *Id*. at 133.

In sum, our task in determining whether the accuseds' clients' interests were adverse at the outset of the SEC investigation under *former* DR 5-105(A)(2) involves determining from the record whether—at that point in time—those interests were contrary or in opposition to one another, or, instead, were consistent or aligned. We now turn to the record to determine whether the Bar proved by clear and convincing evidence that the accuseds' clients' interests were adverse at the outset of the SEC investigation.

B. *No Likely Conflicts at Outset of SEC Investigation*

Several witnesses testified as to the nature of the respective clients' interests at the outset of the multiple representation. Ellis, who was experienced in the field, testified that a public company subject to an SEC investigation has two principal interests: to move the process along quickly toward resolution, and to maintain public confidence. The company's board has similar interests, plus an additional interest in assuring itself that current management maintains accurate financial statements. Officers—who run the risk of liability for past conduct—also share the same interests as the company and have an additional interest in not being damaged by speculative testimony. Employees have an interest in avoiding workplace difficulties, such as fear of retaliation at work or instability of the employer. And, all witnesses have an interest in avoiding becoming embroiled in any "process violation" during the investigation, such as SEC accusations of untruthful testimony, failure to produce

---

[19] According to the court, in the Chapter 11 proceeding, the lawyer had argued on behalf of the investor partnerships that they had financial means to maintain the assets and that their continuing payments to the company would enable the company to meet other obligations. Similarly, in the Chapter 7 proceeding, the lawyer had taken the position that the investor partnerships' payments were made for purposes of preserving the assets. *Cobb*, 345 Or at 133 n 18.

requested documentation, or obstruction of justice. Ellis continued that all those identified interests are served by encouraging truthful, nonspeculative testimony and cooperation with the investigation. Ellis rejected the notion—advanced by the Bar—that FLIR had an interest in restricting the flow of information to the SEC, which would have invited a process violation accusation and could have breached FLIR's fiduciary duties as a public company; instead, FLIR, like the other clients, had an interest in fully cooperating.

Ellis further testified that individual clients did not have the same risks, at the outset of this SEC investigation, that they might have in other litigation contexts. For example, under federal law, potential SEC enforcement defendants at that time were not subject to cross-claims for contribution or other proportionate fault sharing arguments. And, insurance in the SEC investigation context typically covered defense costs for both the company and the individual directors and officers, but not settlement costs, so the clients had no conflicting settlement interests in a common insurance fund.

Both Ellis and Rosenbaum (also experienced in the field) explained that an SEC investigation differs from private securities litigation in other ways, in that (1) no formal charges or allegations have been made; (2) the investigation is factual only—here, to determine if FLIR's restatements were due to innocent errors or fraud—and witnesses are expected only to answer questions to the best of their ability, with no cross-examination; (3) lawyers serve as counsel for witnesses to prepare for and attend interviews, but do not sponsor the witnesses as a lawyer would in trial; and (4) lawyers do not advocate in any way for any client. Relatedly, it was not in any client's interest to project blame on other clients during the SEC investigation stage. As Ellis put it, in the context of an investigation concerning accounting irregularities, a securities violation either occurred or did not occur, and no client has an interest in encouraging the SEC to pursue any particular individual.

Finally, Ellis and Rosenbaum both testified that each of their clients had an interest in learning as much as possible about the SEC's investigation, which the joint

representation—as arranged at the outset—permitted them to do. By responding to document requests, attending witness interviews, and reviewing related documentation, the accuseds were able to alert each client to particular transactions at issue and witness testimony relevant to their own interview preparation, so that they in turn could provide more refreshed, forthright, and honest testimony. The Bar did not effectively counter any of the above-summarized testimony.

As to the individual clients, Glade and Kaner confirmed that the accuseds' joint representation was advantageous to Samper and that, at the outset of the SEC investigation, Samper's interests were aligned with—not adverse to—FLIR's interests. Glade also agreed that Samper's primary interest in testifying was to be truthful with the SEC, and Kaner agreed that all participants had an interest in cooperating. Glade did not recall thinking that the accuseds had any conflict of interest with Samper during the course of the SEC investigation, and Kaner also never concluded that any conflict existed.[20] Wynne and Fitzhenry similarly testified that FLIR had no interest during the SEC investigation in projecting blame on Samper or others.

The accuseds also presented the testimony of an expert witness, Maletta, who was a former SEC lawyer with extensive experience in securities enforcement and governmental investigations, and who had authored part of a leading text that included discussion of ethical issues involved in SEC joint representations. Maletta testified generally about accepted and common practices during an SEC investigation, including a joint representation similar to that arranged here, which can be very advantageous in certain circumstances and was the presumptively preferred approach of many who practiced in the field. Specifically, Maletta testified that it was common practice for a single firm to individually represent the company and subpoenaed company officers and employees, provided that no

---

[20] In other parts of this opinion, we similarly observe that independent counsel for certain clients, with knowledge of the key facts, did not think that any conflict of interest existed as various events unfolded. Although another lawyer's assessment of the existence of a conflict is of course not dispositive, we find such assessments here—made by several experienced lawyers—to be a useful component for our consideration of the Bar's alleged rule violations.

identifiable conflicts of interest exist and the company supports the individuals' positions.[21] Maletta explained that
the interests of all such individuals are typically aligned
because they share an interest in ensuring that no enforcement action is brought against anyone in the group. Maletta
testified, similarly to the testimony of the accuseds, that all
individuals involved typically have the same objectives, such
as cooperating, testifying truthfully, and being forthcoming
with the SEC. Maletta added that it is important in the representation to prevent projecting blame, which is counterproductive and not a useful strategy during the investigation stage, when there are no formal defendants, subjects, or targets. Maletta also confirmed the testimony of
the accuseds, Glade, and Kaner that the principal benefit
of joint representation is that each client obtains access to
information that otherwise would not be available because
the SEC has no obligation to share it. To be sure, Maletta
agreed with the Bar that joint representation can present
potential perils for clients, depending on the circumstances,
and that joint representation of a company and its managers and employees can involve tensions at the outset—
particularly if intentional wrongdoing appears to have
occurred. As noted, however, Maletta also generally testified
about the advantages of joint representation and that the
company's and represented individuals' interests frequently
are aligned at the outset and during the investigation phase
in the manner that he described.[22]

---

[21] Maletta contrasted the type of investigation at issue here—in which,
he explained, the interests of the company and individual clients tend to be
aligned—with an investigation that by its nature would typically involve intentional wrongdoing by one or more persons, such as one involving insider trading,
embezzlement, or obstruction of justice.

[22] In addition to Maletta's general testimony about accepted and common
practices during an SEC investigation, the accuseds sought to introduce additional testimony from Maletta to the effect that the joint representation in this
case was consistent with general practice and that FLIR's and the individual
clients' interests had been aligned at the outset of the SEC investigation. The
Bar objected, and the trial panel ruled that Maletta could testify only in the
abstract as to SEC defense work generally, relying on *In re Leonard*, 308 Or 560,
570, 784 P2d 95 (1989). The accuseds filed an offer of proof containing Maletta's
opinions on case-specific issues and contend on review that the panel's ruling in
that regard was incorrect.

In light of our ultimate conclusion, after reviewing the evidence in the record
that the trial panel admitted, that the Bar did not prove by clear and convincing

The testimony summarized above comprises the essential evidence in the record concerning the propriety of the accuseds' joint representation at the outset of the SEC investigation. The Bar presented no contrary testimony—expert or otherwise—detracting from the evidence showing that joint representation was a common practice in SEC investigations of this kind, that the clients' interests at the outset of such a representation tend to be aligned, and that the joint representation in the context of the SEC's investigation here was appropriate under the circumstances.

Further, although the Bar raises several arguments purporting to show why the accuseds' clients' interests were adverse, those arguments effectively focus on the *potential* for adversity to arise; they do not point to evidence in the record showing that the clients' interests were adverse at the outset. For example, the Bar argues that the interests of FLIR, Daltry, Samper, Fitzhenry, and Eagleburger were adverse because they each had an interest in protecting themselves if the SEC eventually found misconduct to have occurred, including, to the extent necessary, identifying and testifying against each other. As summarized earlier, however, the evidence showed that no client had any interest at the outset of the SEC investigation in projecting blame on others. The Bar also did not prove that the SEC was likely to share its information in this case with other agencies for use in future criminal, disciplinary, or other proceedings: Although the Bar did show that the lawyers and witnesses knew that the SEC was permitted to share its information with other agencies, none of the involved lawyers had any reasonable expectation that the DOJ would involve itself in this particular investigation. The record further shows that, at that point in time, the DOJ typically did not have a significant level of involvement in ongoing SEC investigations, unless it chose to actively step in and stay the SEC proceeding. Finally, the Bar did not present evidence to support its argument that any particular client's hypothetical efforts to take self-protective steps during the SEC investigation in turn might have been adverse to FLIR.

---

evidence the violations alleged in this cause, it is not necessary to address the accuseds' contention on review that the panel erred in rejecting Maletta's case-specific testimony.

We conclude that the Bar did not prove by clear and convincing evidence that the interests of FLIR and the accuseds' individual clients Daltry, Samper, Fitzhenry, and Eagleburger were adverse at the outset of the SEC investigation and therefore did not prove the existence of any current-client likely conflict of interest at that time under *former* DR 5-105(A)(2) and *former* DR 5-105(E). Because we conclude that the Bar did not prove the existence of such a conflict, we need not decide whether the accuseds made sufficient disclosures so as to obtain consent to the joint representation under *former* DR 5-105(F) and *former* DR 10-101(B).[23]

## IV.    SECOND CAUSE—*FORMER* DR 5-105(E), CURRENT-CLIENT ACTUAL AND LIKELY CONFLICTS DURING SEC INVESTIGATION, INCLUDING WELLS PHASE

### A.    *Trial Panel Decision and Parties' Contentions on Review*

The second cause alleged that the accuseds had violated *former* DR 5-105(E) when they continued to represent FLIR on the one hand, and Daltry, Samper, Fitzhenry, and Eagleburger on the other, during the SEC investigation, once it became apparent that actual or likely conflicts had arisen. The Bar's allegations under this cause generally refer to SEC witness interviews and also to the Wells phase. The trial panel rejected several Bar theories under this cause and specifically disagreed with the Bar that any actual conflict of interest arose before the Wells phase, which the Bar challenges on review. The panel did, however, determine that the Bar proved its allegations of likely conflicts of interest and insufficient disclosure under this cause in two respects.

First, the trial panel determined that FLIR's statement in its Wells Submission that referred to the SEC "pursuing fraud claims against one or more individuals who may have been responsible" for the accounting errors, "to the extent that wrong-doing may have occurred," established that FLIR's interest in the SEC representation was adverse

---

[23] We generally note, however, that a lawyer taking on a similar joint representation should—in the exercise of caution—consider following applicable full disclosure rules as to the key participants.

to those of Samper, Fitzhenry, and Eagleburger. In the panel's view, that statement told the SEC that FLIR had concluded that wrongdoing had occurred and that fraud claims perhaps were appropriate as to those individual clients—who all ultimately had received Wells Notices and who each had an interest in having FLIR refrain from acknowledging that any wrongdoing had occurred. Because the accuseds did not make full disclosure to or obtain consent from those clients as to continuing the joint representation, the panel concluded that the accuseds had violated *former* DR 5-105(E). The accuseds challenge that conclusion on review.

Second, the trial panel determined that Rosenbaum had violated *former* DR 5-105(E) when she called the SEC on October 3, 2002, to inquire about the lack of reference to the Swedish Drop Shipment in the SEC complaint against Stringer. According to the panel, that phone call—made in behalf of FLIR and Wynne—had been adverse to Samper's interests. The panel analyzed the phone call under the Bar's sixth cause, which more generally had alleged a current-client conflict between Wynne and Samper (and others), and did not specifically mention the phone call. On review, the Bar contends that Rosenbaum's October 3, 2002, phone call to the SEC fell within its general allegations under the second cause and that the panel's conclusion was correct under that cause. The accuseds, for their part, challenge on review any determination that a rule violation occurred based on Rosenbaum's phone call to the SEC.

We address the parties' arguments under this cause in three parts: the SEC investigation leading up to the Wells phase; the Wells phase; and Rosenbaum's October 3, 2002, phone call to the SEC.

B.  *No Current-Client Likely Conflicts During Pre-Wells Phase*

In disagreeing with the trial panel's conclusion that the Bar did not prove any likely conflict of interest during the SEC investigation up to the Wells phase, the Bar argues that (1) as witnesses provided information to the SEC, likely conflicts of interest under *former* DR 5-105(A)(2) arose between FLIR and the individual clients; (2) during that time, any self-protective step that any individual client took

was arguably adverse to other clients and to FLIR, which had an interest in setting a cooperative tone with the SEC; and (3) as the investigation progressed, FLIR's interest in remediation grew stronger, which in turn was adverse to certain individual clients' interests in remaining employed and in preserving favorable professional reputations. In response, the accuseds point to evidence in the record that they assert supports the panel's conclusion that no likely conflicts arose in this time frame.

As with our earlier discussion about alleged conflicts at the outset of the SEC investigation, the Bar bears the burden of proving by clear and convincing evidence that the accuseds' clients' "objective personal, business or property interests [were] adverse" at the time in question. *Former* DR 5-105(A)(2). Also as part of our analysis, we consider *former* DR 5-105(B), which provided that, "[f]or purposes of determining a lawyer's knowledge of the existence of a conflict of interest, all facts which the lawyer knew, or by the exercise of reasonable care should have known, will be attributed to the lawyer." Again, on *de novo* review of the record, we conclude that the Bar did not prove the existence of any likely conflict of interest up to the Wells phase. We address the Bar's arguments in turn, below.

Regarding witness testimony, the Bar in particular cites SEC interviews of Fitzhenry, Wynne, Muessle (FLIR's then-current controller), and Chambers (the employee who testified about document destruction), and argues that those witnesses offered testimony that was adverse to Samper's interests. We consider four aspects of that testimony and, as did the trial panel, conclude that the Bar did not show that the testimony demonstrated the existence of any likely conflict of interest.[24]

--------

[24] We focus on the four topic areas addressed in greatest detail at the trial panel hearing. In the facts section of its brief, the Bar generally states that several clients commented unfavorably on the credibility of others during their SEC interviews and lists isolated factual assertions from several witnesses' interviews, including witnesses other than the four mentioned in the text above. In the argument section of its brief, however, the Bar states only very generally that the accuseds heard all those witnesses offer SEC testimony that was adverse to Samper, with no elaboration. The record in this case—which includes lengthy excerpts from several SEC transcripts—is almost 12,800 pages long. We decline to examine each isolated, separate factual statement set out in the Bar's brief

As to Fitzhenry, the SEC asked him about the 1999 management representation letter that he and Samper (and others) had signed, which had served to confirm the accuracy of certain 1999 FLIR quarterly results. The letter had confirmed that FLIR had recognized certain revenue properly, but that representation later was determined to be incorrect. Fitzhenry's practice had been to sign such letters, based on representations from Samper or the former FLIR controller that the accounting representations made therein were true. Fitzhenry told the SEC in at least one interview that he did not recall having any particular conversation with Samper about the letter at issue—concerning the specific accounting-related content in the letter or otherwise—other than Samper asking him to sign it. In response to questions about conversations with Samper about the letter, Fitzhenry stated in that interview that "the discussions that I would have had were more general in nature, *** representations from either [Samper] or [the former controller], *** someone who was [also] a signatory of the letter, that the representations were true. *** [B]ased on those representations, generally, I signed the letter as well." For his part, Samper did not recall any particular conversation with Fitzhenry about the letter.[25] In the Bar's view, Fitzhenry's SEC testimony showed an adversity of interest between Fitzhenry and Samper, based on Fitzhenry's reliance on Samper's general assurance that the contents of the letter had been accurate.

We disagree. First, the record shows that Samper reasonably would have expected Fitzhenry to rely on his assurances about accounting representations in the letter because Samper, as CFO, accepted responsibility for FLIR's accounting. Nothing about Fitzhenry's stated reliance on

without further explication from the Bar, such as providing context or a purported link between each statement and the existence of a current-client likely conflict.

[25] Fitzhenry later testified at his own trial panel matter, as well as to the trial panel below, that he recalled generally asking Samper if the contents of the letter were accurate, and Samper indicated that they were. Fitzhenry's SEC testimony in the record that the Bar cites does not include that specific recollection on his part. And, in any event, Fitzhenry emphasized in both his Bar matter and in this proceeding that Samper had a different recollection, in that he did not recall any particular conversation about the contents of the letter.

Samper established an adversity of interests between the two clients. Second, we do not read Fitzhenry's testimony—as does the Bar—to have stated that he recalled having had a specific conversation with Samper about the 1999 management representation letter in which Samper assured him as to its accuracy; instead, Fitzhenry only generally described the process that typically occurred when he was presented with such letters. And, even if we read Fitzhenry's testimony to mean that he had asked Samper for general accounting assurances relating to that particular letter, when Samper did not recall a similar conversation, such a scenario does not prove by clear and convincing evidence that an adversity of interest existed. The record shows—through testimony from both the accuseds and their expert witness, Maletta—that differing recollections are common during the SEC interview phase. It also shows that Fitzhenry and Samper shared the objective of providing truthful testimony about their respective recollections. Finally, it shows that the accuseds sent a transcript of Fitzhenry's SEC testimony to Glade and Kaner, and they did not think that Fitzhenry's testimony demonstrated any conflict with Samper.[26] In short, Fitzhenry's SEC testimony did not establish by clear and convincing evidence that a likely conflict of interest existed between either FLIR or Fitzhenry and Samper during the SEC interview phase.

As to Wynne, the Bar first focuses on Wynne's SEC testimony that FLIR's new independent auditor had concluded that a high percentage of FLIR's accounting entries had been erroneous and had observed that, in Wynne's words, "it's hard to imagine that you could get more transactions wrong than you got right." The Bar reads that testimony as an inference by the auditor that some intentional wrongdoing had occurred, perhaps on Samper's part, but Wynne denied in that same interview that the auditor ever had communicated to FLIR any conclusion about intentional wrongdoing. And, when viewed in context, Wynne's testimony about the high percentage of errors related to

---

[26] Fitzhenry testified in October 2000, and the transcript was sent to Kaner in April 2001. Both Glade and Kaner generally testified that they did not think, through the entry of the SEC settlements in September 2002, that any conflict existed between any of the accuseds' clients and Samper.

Stringer, not Samper; he specifically identified the auditor's assessment as a contributing factor in FLIR's decision to ask Stringer to resign.[27] That testimony therefore does not provide a basis for concluding by clear and convincing evidence that a likely conflict of interest existed between FLIR and Samper during the SEC interview phase.

The Bar also emphasizes Wynne's trial panel testimony about his ultimate conclusion—while the SEC investigation was ongoing—that Samper's actions had amounted to securities fraud. Specifically, by spring 2001, Wynne had concluded that Samper had made entries and submitted financial statements that contained figures manipulated as a result of fraud; that is, that Samper had filed financial statements with the SEC based on entries that Samper by his own admission either knew to be inaccurate or did not know their accuracy. In Wynne's view, that conduct amounted to securities fraud as legally defined, even though Wynne had not necessarily concluded that Samper himself had manipulated any figures. The record shows that Wynne offered that testimony carefully, so as not to assert any belief on his part that Samper had engaged in intentional wrongdoing.[28] And, in any event, neither accused learned until several years later that Wynne had reached that general conclusion. Nothing about that testimony from Wynne demonstrated that FLIR had an interest adverse to Samper's of which either accused reasonably would or should have been aware during the interview phase of the SEC investigation. *See former* DR 5-105(B) (for purposes of determining lawyer's knowledge of existence of conflict of interest, all facts that lawyer knew or by exercise of reasonable care should have known are attributed to lawyer).

---

[27] We further note that, the day after Wynne's SEC interview, the accuseds had a conversation with Glade in which Ellis generally described Wynne's testimony, including other testimony that the FLIR board's concerns about Samper had involved competence, not any integrity or honesty problem.

[28] The Bar also points to Wynne's trial panel testimony as to his belief that Samper had "manufactured" the $4.6 million figure reflected by the Swedish Drop Shipment. Wynne later elaborated on that comment, however, testifying to his understanding that Samper's figures had originated with Stringer and that he had assessed Samper as having engaged in securities fraud based on Samper's entry of Stringer's figures into FLIR's books, made while in his capacity as CFO, when he might not have known with certainty whether an underlying transaction had occurred or whether sufficient documentation supported such an entry.

As to Muessle, the Bar states that he identified in an evaluation for FLIR and FLIR's new independent auditor questionable transactions that implicated Samper in wrongdoing, which FLIR—through the accuseds—sent on to the SEC. Muessle testified at the trial panel hearing about his evaluation, which had explained to FLIR's auditor why certain transactions had been restated due to lack of supporting documentation and also discussed other problematic transaction reviews. None of Muessle's evaluation documentation in the record mentioned Samper in a negative light, and none of Muessle's panel testimony suggests that he ever thought that Samper had engaged in intentional wrongdoing. Notably, also during the SEC interview phase, Rosenbaum provided similar documentation on Muessle's transaction reviews to Glade and Kaner; as noted above, Glade and Kaner never concluded during the course of the SEC investigation—based on information that they received from the accuseds on an ongoing basis—that Samper's interests were adverse to FLIR's. The Muessle testimony and evaluation documentation did not establish by clear and convincing evidence that any adverse interest arose between FLIR and Samper during the SEC interview phase.

As to Chambers, the Bar focuses on her testimony about document destruction and other questionable representations on Samper's part about shipped inventory, which the Bar views as having implicated Samper in wrongdoing. The record shows, however, that Chambers was a lower-level employee without sufficient understanding of all the detail surrounding FLIR's shipping arrangements and accounting processes, and so her testimony did not demonstrate adversity with Samper in the manner that the Bar contends. Indeed, Kaner testified that she and Glade had discussed the possibility that Chambers's testimony demonstrated a conflict, but they agreed that a conflict had not arisen and that the interests of FLIR and Samper remained aligned. In that regard, we agree with the accuseds that Chambers's testimony illustrated a benefit of the joint representation: Because Rosenbaum represented both Chambers and Samper for purposes of the SEC interview phase, she was present for Chambers's interview and then was able to confer with Glade and Samper, and adequately prepare

Samper, so as to provide the SEC with explanations about issues arising from Chambers's testimony—particularly concerning circumstances about which Chambers had been unaware. We disagree with the Bar that Chambers's testimony showed an adverse interest between FLIR and Samper during the SEC interview phase.

The Bar next contends that self-protective actions taken by individual clients during the SEC interview phase showed that those clients had interests adverse to FLIR's. The Bar cites two examples, both of which appear from the record to have been joint tactical recommendations made to Samper by Glade, Kaner, and the accuseds: (1) Samper participating in the SEC interviews instead of asserting his Fifth Amendment privilege against self-incrimination; and (2) Samper testifying early in the proceedings, to clarify some SEC factual misunderstandings and to further the joint strategy of showing that only innocent errors, not intentional wrongdoing, had occurred.

In the Bar's view, the lawyers' Fifth Amendment waiver advice showed that Samper had individual considerations that were adverse to FLIR's. The record establishes, however, that the four lawyers agreed that it was in Samper's best interest to cooperate with SEC interview requests and that none of the lawyers reasonably could have anticipated, during the SEC interview phase, that a DOJ investigation was forthcoming. As to the lawyers' early testimony advice, the Bar asserts that that decision harmed Samper in the ensuing DOJ investigation because the SEC viewed him critically before all documentation was in order, later giving the impression that he had not been honest. The record does show that, in the end, the SEC determined that Samper had been disingenuous at best and had been trying to either mislead the SEC or distract from the full truth of what had occurred. During the SEC interview phase, however, Glade and Kaner continued to think that cooperation and forthcoming testimony was in Samper's best interests, and both had concurred in the decision to have Samper testify early.[29] We disagree that those two tactical decisions

---

[29] The Bar cites a letter that Kaner wrote to the accuseds several years later, noting that Samper's early testimony—intended to comply with FLIR's efforts to cooperate with the SEC—had put him on the spot before the documentation was

showed an adversity of interests between Samper and FLIR, and the Bar points to no other evidence of individual clients' self-protective steps that might have showed such an adversity.[30]

The Bar also argues that FLIR's interest in adopting a remediation strategy grew as the pre-Wells investigation phase progressed, which was adverse to the individual clients' interests in remaining employed and preserving a sound professional reputation.[31] The Bar further asserts that FLIR positioned itself during the investigation to seek favorable treatment at the expense of individual clients Daltry, Samper, and Eagleburger. The record shows, however, that FLIR's general strategy during the SEC interview phase remained the same all along—that is, to cooperate; to not admit that either FLIR or any of the accuseds' individual clients had engaged in fraud; and, eventually, to focus the SEC on FLIR's remediation improvements since the 1998 and 1999 accounting errors. Although, again, the potential for adversity existed, the record does not show that the clients' interests were adverse during the SEC interview phase and therefore does not establish that any current-client likely conflict of interest existed.

---

complete and gave the impression that he had not acted honestly, which may have contributed to his criminal indictment. The question under *former* DR 5-105(A)(2), however, is whether the accused lawyer reasonably knew that the clients' interests were adverse at the time in question. Kaner's hindsight observation, following several years' worth of additional developments including a criminal prosecution, does not amount to clear and convincing evidence that the accuseds knew that any actual adversity existed during the SEC interview phase. At that time, the possibility continued that FLIR's and Samper's interests might diverge, but, as explained above, none of Samper's four lawyers ever concluded during that period in time that any adversity in fact had arisen, and nothing in the record counters that assessment.

[30] The Bar cites Am. Bar Ass'n, Section of Bus. Law, *The Securities Enforcement Manual* 477 (1997), for the proposition that company officers, directors, and employees involved in an SEC investigation have an opportunity to limit individual exposure if they cooperate with the SEC. However, the Bar cites to no evidence in the record—other than that discussed above—showing that any of the accuseds' clients in this case took any self-protective step that established by clear and convincing evidence that their interests were adverse to FLIR's.

[31] The Bar again cites *The Securities Enforcement Manual* at 477: "Corporations may avoid or lessen liability by taking prompt action to replace wrongdoers and showing that the wrong was a matter of individual not corporate fault. These possibilities create considerable room for conflicts to develop."

C.  *No Current-Client Actual or Likely Conflicts of Interest During Wells Phase*

1.  *General Discussion*

The trial panel concluded that a single statement in FLIR's Wells Submission—that FLIR understood that the SEC was pursuing fraud claims against one or more people responsible for its accounting issues—established a current-client likely conflict of interest between FLIR and Samper, Fitzhenry, and Eagleburger, all of whom received Wells Notices, and that the accuseds did not disclose that conflict. On review, the accuseds challenge that conclusion, arguing that FLIR's interests were not adverse to those three individual clients during the Wells phase. The Bar, for its part, contends that various parts of FLIR's Wells Submission showed that current-client *actual* conflicts of interest arose during the Wells phase between FLIR and the identified clients, and those actual conflicts could not be waived, even following full disclosure, under *former* DR 5-105(F).[32]

The following facts are important to fully address the parties' arguments. The SEC issued Wells Notices to four of the accuseds' clients—FLIR, Samper, Fitzhenry, and Eagleburger—and also to Stringer and Martin (and others). Upon receipt of Samper's Wells Notice, Glade and Kaner transitioned to lead counsel during the Wells phase and ensuing negotiations, and the accuseds transitioned to a supporting role. Upon receipt of Fitzhenry's and, later, Eagleburger's Wells Notices,[33] Ellis conferred with each of those clients, told them that they immediately needed to retain independent counsel, and then offered to serve as supporting co-counsel as needed—ultimately providing some support for both clients based on requests from their individual lawyers. As for FLIR, the accuseds (mostly Ellis), Wynne, and Fitzhenry worked on FLIR's Wells Submission,

---

[32]  We note that the trial panel specifically found that the identified statement in FLIR's Wells Submission amounted to a conflict of interest between FLIR and several of the accuseds' individual clients. The Bar clarifies—and we agree—that the question is not whether that statement itself *constituted* a conflict, but, rather, whether that statement provided *persuasive evidence* that a conflict existed.

[33]  Eagleburger's Wells Notice was not received until after FLIR had filed its Wells Submission.

which FLIR filed with the SEC without first sending to the accuseds' other clients for review.

FLIR's Wells Submission focused on FLIR's remediation efforts and stated that it had "removed" those "senior managers who were responsible for the accounting errors and the management problems, including the President and CEO, Stringer." It next referred by position (not by name) to other former management personnel no longer with the company, including Daltry and Samper (both identified as having resigned earlier), and Eagleburger and Martin (both identified as having been terminated). It continued that, "[h]aving satisfied itself that it had identified and removed all those in senior management who were responsible for the Company's troubles, the Board immediately turned its attention to assisting remaining management in rescuing and then improving the Company." FLIR's Wells Submission later stated, under "Remediation," that "[t]he individuals who were responsible for the accounting errors have been terminated, and the Company is under new executive and financial management." In its final, "Offer of Settlement" section, FLIR's Wells Submission stated that, "to the extent wrong-doing may have occurred, we understand that the SEC is pursuing fraud claims against one or more individuals who may have been responsible," inferentially intended to refer to Stringer and Martin. Throughout, FLIR's Wells Submission described the 1998 and 1999 accounting issues as "errors" or "problems," not "fraud," which carried a critical distinction in the securities context.

The record shows that, in drafting and filing FLIR's Wells Submission, the accuseds and FLIR did not seek to cast a negative light on either Samper or Eagleburger, and FLIR's Wells Submission objectively did not expressly take any particular position or make any characterization about either of them, other than noting the former CFO's (Samper's) cooperation with the SEC investigation. It included one express favorable reference to Fitzhenry, in an effort to confirm his positive participation as part of the new management team. At the time that FLIR prepared its Wells submission, the accuseds had concluded that only Stringer and Martin had acted fraudulently. Also at that time, Eagleburger had not

yet received a Wells Notice. And, although Glade initially thought that FLIR's Wells Submission reflected poorly on Samper, he and Kaner continued to communicate regularly with the accuseds as Samper's co-counsel and also continued to think that FLIR's and Samper's interests were aligned for purposes of the SEC proceeding. During the Wells phase, the accuseds and the other individual lawyers reasonably— but, as it turns out, incorrectly—anticipated that no criminal investigation would occur.

### 2. *No Current-Client Actual Conflict*

The Bar first contends that the statement in FLIR's Wells Submission about the SEC pursuing fraud claims against those responsible for the accounting issues— particularly when considered with other components of FLIR's Wells Submission discussed above—demonstrated an actual, nonwaivable conflict of interest under *former* DR 5-105(A)(1) between FLIR and the accuseds' individual clients Daltry, Samper, and Eagleburger. *See former* DR 5-105(F) (only current-client likely conflicts can be waived by client consent after full disclosure). The Bar thinks it significant that, when the SEC sent the individual Wells Notices, the accuseds learned who the SEC considered to be wrongdoers, giving weight to the argument that FLIR itself should not be punished. At that point, the Bar continues, the accuseds' duty to FLIR to admit misconduct by Daltry, Samper, and also Eagleburger (who received a Wells Notice later) became irreconcilable with their duty to refrain from accusing those three individual clients of wrongdoing. Nonetheless, the accuseds then prepared and filed FLIR's Wells Submission, which—in the Bar's view—inferentially referred to Daltry, Samper, and Eagleburger as wrongdoers.[34]

*Former* DR 5-105(A)(1) defines an actual conflict for purposes of *former* DR 5-105(E) as a scenario in which a

---

[34] The Bar also contends on review that an actual conflict of interest existed when the accuseds negotiated FLIR's SEC settlement, which resulted in a judgment that included—without admitting or denying—a finding of fraud by prior management. However, the Bar's allegations in the second cause end with the filing of FLIR's Wells Submission and do not mention FLIR's settlement negotiations, and no other allegation refers to FLIR's settlement negotiations. We therefore do not discuss any Bar argument relating to those negotiations or the final SEC judgment against FLIR.

lawyer "has a duty to contend for something on behalf of one client that the lawyer has a duty to oppose on behalf of another client." Similarly to our earlier discussion about likely conflicts of interest, such conflicting obligations often are readily apparent from the nature of the representations and client interests involved. *See In re Bristow*, 301 Or 194, 204, 721 P2d 437 (1986) (actual conflict of interest when lawyer represented one client in action to enforce franchise agreement while simultaneously representing other client in action seeking to hold same agreement invalid; citing cases for same proposition). The court also has explained, however, that the clients' underlying objective interests at the time in question determine the nature of any obligation on the lawyer's part to contend for or oppose a particular legal position on each client's behalf. *See Cobb*, 345 Or at 133 (lawyer represented both investor partnerships and entity related to company in which they had invested in complex bankruptcy proceedings; at time in question, investor partnerships not necessarily entity's creditors, and all parties shared goal of dismissal; no actual conflict); *Cohen*, 316 Or at 662 (whether actual conflict exists depends on clients' objective interests).

Here, the record does not establish the existence of conflicting duties relating to the accuseds' representation and protection of their respective clients' objective interests during the Wells phase. The fact that Wells Notices had issued and the clients then considered and developed responses to them did not, standing alone, mean that the accuseds had a duty to contend for a particular position on FLIR's behalf that they had a duty to oppose on behalf of Daltry, Samper, or Eagleburger. Indeed, the record shows that FLIR would have been responsible for fraud committed by its officers, managers, and employees, in the context of the SEC's investigation.[35]

As to FLIR's particular Wells strategy, the record shows that FLIR had an objective interest in convincing the SEC of the sincerity and significance of its remediation

---

[35] As noted earlier, *see* 356 Or at ___ n 9, the findings of fraud in the SEC's ultimate judgment against FLIR—based on various individual personnel actions—resulted in FLIR losing its safe harbor protections under federal securities law.

efforts, including its transition to new management. Nothing about that interest obligated the accuseds to assert on FLIR's behalf a position that they were obligated to oppose in representing the interests of Daltry, Samper, or Eagleburger—such as, as the Bar contends, asserting that one or more of those clients had engaged in intentional wrongdoing. And, although FLIR's new management did not include Daltry, Samper, or Eagleburger, the accuseds were not obligated on behalf of those clients to oppose FLIR's focus on its remediation strategy. Indeed, expert testimony in the record established that a remediation defense, not unusual in an SEC proceeding of this kind, focuses on the future as opposed to any action that occurred in the past. And finally, none of the lawyers involved—including the independent lawyers—thought that a conflict existed; as to Samper specifically, Glade continued to think that no conflict existed even after he had reviewed and considered FLIR's Wells Submission. The trial panel correctly determined that no actual conflict of interest existed between FLIR and the accuseds' individual clients Daltry, Samper, and Eagleburger during the Wells phase.

### 3. *No Current-Client Likely Conflict*

Next, the accuseds contend that the trial panel erred in concluding that the statement in FLIR's Wells Submission about pursuit of fraud claims against responsible individuals established an adversity of interests, and therefore a likely conflict, between FLIR and individual clients Samper, Fitzhenry, and Eagleburger. The accuseds specifically argue that that statement did not suggest or imply that those individual clients had committed fraud or encouraged the SEC to act against any client; instead, FLIR's Wells Submission identified only Stringer and, inferentially, Martin, as individuals who had been "removed" from employment and (again, inferentially) were presently the subject of SEC fraud claims. Otherwise, FLIR framed its response in light of remediation, which accused no client of earlier wrongdoing. The accuseds also emphasize that FLIR's Wells Submission labeled FLIR's 1998 and 1999 accounting issues as "errors" and "problems"—words that objectively and understandably did not admit, indicate, or imply fraud on the part of anyone

at FLIR. The Bar, as noted (and rejected) above, responds by contending that FLIR's Wells Submission showed an actual conflict of interest between FLIR on the one hand, and Samper and Eagleburger on the other. Here, we consider the Bar's underlying arguments about an actual conflict of interest to determine whether the Bar proved a likely conflict of interest as to the three clients that the panel identified (Samper, Fitzhenry, and Eagleburger).

As already explained, a likely conflict of interest existed if the "objective personal, business or property interests" of FLIR and the accuseds' individual clients "[we] re adverse," *former* DR 5-105(A)(2)—that is, if their objective interests were contrary or in opposition to one another at the time in question. This court has explained that the representation of multiple clients embroiled in the same action often gives rise to likely (and sometimes actual) conflicts, due to the clients' adversity of interests. In the criminal context, for example, such an arrangement typically results in an actual or likely conflict, due to the potential interest of one client in obtaining a favorable outcome in exchange for testifying or offering evidence against another client. *Jeffery*, 321 Or at 370-71; *see also id.* at 372-73 (statements to police by one client that implicated another client amounted to actual or likely conflict); *O'Neal*, 297 Or at 260-66 (likely conflict when representing criminal codefendants, even where lawyer limited representation to negotiating pleas). Adverse interests of course can arise in other contexts, as well. *See In re Barber*, 322 Or 194, 200, 904 P2d 620 (1995) (under earlier version of *former* DR 5-105, likely conflict when lawyer represented two parties injured in same motor vehicle accident, where insurance proceeds insufficient to cover injuries of both). In determining whether the Bar proved that a likely conflict existed at the time in question, we must identify, based on evidence in the record, the objective interests involved. *See Cohen*, 316 Or at 661-62 (in determining that husband and wife had adverse interests in husband's criminal mistreatment proceeding and wife's pending juvenile proceeding, court identified objective personal interests of each at the time in question, notwithstanding earlier client declarations that they shared a common goal).

As noted earlier, the record shows that FLIR's objective interest during the Wells phase was to persuade the SEC that, from a forward-looking perspective based on multiple changes that had been made, FLIR should not be subject to any SEC enforcement action. FLIR's actions in crafting its Wells Submission advanced that interest; specifically, it sought to frame the accounting events in a neutral manner and then to focus the SEC on its remediation efforts—such as new management, a larger, professional accounting staff, a new independent auditor, and clean audits following the years in question. By contrast, FLIR did not have any objective interest in focusing on past liability or engaging the SEC in any factual argument about events underlying the 1998 and 1999 accounting issues; the record shows that it would have been counterproductive during the Wells phase for FLIR to argue about those events. Additionally, as noted earlier, FLIR had no interest in seeing any officer, manager, or employee accused of fraud, for which FLIR ultimately would have been responsible.

Like FLIR, clients Samper, Fitzhenry, and Eagleburger each shared an objective interest during the Wells phase in mitigating against a negative individual outcome from the SEC proceedings, including an interest in avoiding ancillary and collateral consequences that might apply to them as individuals, but not to the company. For example, in addition to a separate SEC enforcement action, Samper was potentially subject to disgorgement penalties, and Fitzhenry was potentially subject to a sanction that would have prevented him from practicing before the SEC.[36] Also, as part of their individual defenses, the clients—like FLIR—had an interest in convincing the SEC that they had not engaged in fraud. As the Bar argues (and the accuseds do not disagree), those three clients also shared a general interest in not having FLIR accuse them of wrongdoing.

We conclude that the Bar did not prove by clear and convincing evidence that FLIR's interests were adverse to those of Samper, Fitzhenry, or Eagleburger during the Wells phase. As explained, all the clients shared an interest in

---

[36] In that regard, we note that concerns that might have arisen in the civil action context—such as joint and several liability, cross-claims, or competing interests in insurance proceeds—did not apply in the SEC context.

mitigating against a negative outcome in the SEC investigation. The fact that different consequences could flow from negative outcomes—for example, to FLIR as a company, to Samper as a former officer, or to Fitzhenry as General Counsel—does not mean that the respective clients' interests were necessarily adverse to each other. And, as discussed above, the record shows that none of the lawyers or individuals involved anticipated, during the Wells phase, that any DOJ investigation—which certainly carried at least the potential for future adverse conflicts of interest—might be forthcoming. *See former* DR 5-105(B) (when determining lawyer's knowledge of existence of conflict, all facts that lawyer knew or reasonably should have known are attributed to lawyer).[37]

        As to FLIR's prospective remediation defense specifically, expert testimony established that it was a recognized strategy in SEC investigations of this kind, even where joint representation had occurred. Although isolated statements in FLIR's Wells Submission arguably could be read to inferentially cast a negative light on Samper or Eagleburger, other evidence in the record provides contrary context to those statements, regarding FLIR's remediation defense and its objective interest in persuading the SEC to look forward, not backward. For example, expert testimony showed that a remediation defense typically involves differing arguments for the company than for individuals, but that does not necessarily mean that their interests are adverse. Indeed, joint representation in SEC proceedings often continues in the same fashion that it did here—with the company's lawyers continuing to represent individual clients in a supporting role during the Wells phase—because the clients' various defenses can be synthesized with each other, even if they are not identical. That is essentially what transpired here. FLIR had an objective interest in focusing the SEC on remediation, and FLIR's Wells Submission therefore did not engage the SEC about the earlier accounting issues; instead, it focused on prospective remediation. By contrast,

---

[37] Additionally, unlike the Bar and the trial panel, we read the statement in FLIR's Wells Submission about the SEC "pursuing fraud claims against one or more individuals who may have been responsible" as a factual observation about actions that the SEC had taken, not as a *recommendation* on FLIR's part that the SEC *should* pursue a fraud claim against any particular individual.

the individual clients each defended their own interests, some by focusing on earlier events as needed.[38] The record does not clearly and convincingly support the Bar's theory that FLIR and the individual clients had objective interests during the Wells phase that were adverse to each other.[39]

### D. *Rosenbaum's Phone Call to SEC Concerning Swedish Drop Shipment Not Within Scope of Second Cause*

The trial panel concluded that Rosenbaum's October 3, 2002, phone call to the SEC to inquire about the Swedish Drop Shipment entry demonstrated the existence of either an actual or likely conflict under *former* DR 5-105(E) between FLIR and Wynne on the one hand, and Samper on the other, that Rosenbaum did not disclose. As noted, the panel found that to be a violation under the sixth cause, which had alleged current-client actual or likely conflicts between Wynne and Samper.[40] The Bar asserts on review that Rosenbaum's phone call to the SEC fell under its second cause, which alleged similar conflicts between FLIR and the accuseds' individual clients, including Samper, during the SEC investigation through the Wells phase. The accuseds disagree that Rosenbaum's phone call fell within the scope of any allegation and contend that the panel erred in determining that any violation had occurred. As explained below, we agree with the accuseds.

---

[38] Fitzhenry's Wells Submissions engaged the SEC about past events relating to his signature on the 1999 management representation letter. Samper, for his part, opted not to file a Wells Submission at all, and Eagleburger's Wells Submission does not appear to be in the record. Nothing in FLIR's Wells Submission was inconsistent with the individual clients' objective interests in convincing the SEC that they each had not engaged in any intentional wrongdoing or in mitigating against negative outcomes.

[39] The Bar also argues that FLIR's Wells Submission contained statements that showed adverse interests between FLIR and Daltry. Daltry did not receive a Wells Notice, however, and so the accuseds' representation of him effectively had ended when he completed his SEC testimony. The Bar did not prove any current-client conflict of interest between FLIR and Daltry during the Wells phase.

[40] The Bar's sixth cause alleged that Wynne's SEC testimony had implicated Daltry and Samper as responsible for FLIR's 1998 and 1999 financial misstatements and accounting errors; however, Rosenbaum's phone call did not pertain to Wynne's testimony. The trial panel acknowledged that the Bar did not specifically allege wrongdoing on Rosenbaum's part regarding the information conveyed to the SEC in her phone call but invoked ORCP 23 B in determining that a violation had occurred. *See* ORCP 23 B (when issues not raised by pleadings are tried by parties' express or implied consent, those issues shall be treated as if they had been raised in the pleadings).

An accused lawyer must be put on notice "of the conduct constituting the violation," as well as the rule violation at issue. *In re Magar*, 296 Or 799, 806 n 3, 681 P2d 93 (1984). In that regard, BR 4.1(c) provides, in part:

> "A formal complaint shall *** set forth succinctly the acts or omissions of the accused, including the specific statutes or disciplinary rules violated, so as to enable the accused to know the nature of the charge or charges against the accused. "

That rule "does not obligate the Bar to plead any fact regarding a charge *** beyond those that the *** [*former*] disciplinary rules identify." *In re Kluge*, 332 Or 251, 262, 27 P3d 102 (2001). The Bar must, however, sufficiently allege facts in connection with the charged allegation. *Compare In re Albrecht*, 333 Or 520, 544, 544 n 20, 42 P3d 887 (2002) (rejecting argument that complaint insufficiently alleged conversion for lawyer's own use because one aspect of allegation described and alleged that type of conversion), *with In re Spencer*, 355 Or 679, 689, 30 P3d 538 (2014) (court did not address theory of "personal interest" not alleged as conflict of interest violation), *and Magar*, 296 Or at 803, 806 n 3 (Disciplinary Board erred in basing rule violation on certain aspects of problematic client representation not alleged or described in complaint), *and In re Lasswell*, 296 Or 121, 128, 673 P2d 855 (1983) (Disciplinary Board erred in basing rule violation concerning prosecutor's extrajudicial statements on particular events not charged in complaint; only factual event described in complaint provided basis to analyze alleged rule violation). *See also State ex rel Currin v. Comm'n on Judicial Fitness*, 311 Or 530, 533, 815 P2d 212 (1991) (adequate notice is necessary component of due process); *In re Chambers*, 292 Or 670, 676, 642 P2d 286 (1982) (trial panel erred in reaching guilt determination as to misrepresentation; although proof supported panel's determination, complaint contained no allegation putting lawyer on notice that being charged with misrepresentation).

As discussed earlier, in this case, the Bar's second cause alleged conflicts of interest among the accuseds' current clients during the SEC investigation. That cause contained one allegation that—in isolation—arguably could be

read to encompass Rosenbaum's October 3, 2002, phone call to the SEC:

> "Represented by [Rosenbaum] and Ellis, FLIR agreed to cooperate fully with the SEC in its investigation *and revealed to the SEC information that implicated \*\*\* Samper \*\*\* as responsible for the misstatement of FLIR's 1998 and 1999 financial status and for FLIR's accounting, record-keeping, and financial reporting practices in 1998 and 1999.*"

(Emphasis added.) When read in its entirety, however, the unmistakable purpose of the second cause was to allege misconduct—including FLIR's alleged revealing to the SEC of information unfavorable to Samper and others—occurring within a particular time frame that began with the special committee's determinations by summer 2000, continued through the SEC investigation and interviews in 2000 and 2001, and ended in March 2002 with FLIR's filing of its Wells Submission. Rosenbaum's phone call to the SEC occurred on October 3, 2002, after the SEC's judgments against FLIR and Samper had been entered, and well after the time frame referred to in the Bar's second cause. That cause therefore did not sufficiently allege facts to permit Rosenbaum "to know the nature of the charge \*\*\* against [her]," BR 4.1(c), respecting any implication flowing from her phone call to the SEC. The trial panel erred in concluding otherwise.[41]

## V.  TENTH CAUSE (ELLIS ONLY)—*FORMER* DR 5-105(C), FORMER-CLIENT LIKELY CONFLICT DURING FITZHENRY BAR MATTER

### A.  *Trial Panel Decision and Parties' Contentions on Review*

The tenth cause against Ellis alleged that Ellis's representation of Fitzhenry in his Bar matter after the Daltry

---

[41] As noted earlier, 356 Or at ___ n 40, the trial panel invoked ORCP 23 B in determining that Rosenbaum's October 3, 2002, phone call to the SEC showed that a likely conflict of interest existed between FLIR and Wynne, and Samper. This court never has concluded that ORCP 23 B applies in Bar proceedings, and nothing in the Bar Rules of Procedure suggests that application of ORCP 23 B is permitted or appropriate. By contrast, as explained above, the Bar Rules require that the complaint notify the accused lawyer of the alleged misconduct at issue.

and Samper SEC representations had ended—including continuing to assert on Fitzhenry's behalf that he had relied on Daltry's and Samper's assurances when signing the 1999 management representation letter that also had been at issue in the SEC proceeding—amounted to a former-client conflict of interest under *former* DR 5-105(C) that Ellis had been obligated to disclose to both Daltry and Samper, so as to obtain their consent to his representation of Fitzhenry. The trial panel concluded that the Bar did not prove that Ellis's representation of Fitzhenry was or was likely to be adverse to Daltry's or Samper's interests in the DOJ investigation, and, therefore, no conflict existed. The Bar challenges that conclusion on review. Ellis first responds by emphasizing that the Bar's allegation focuses on Fitzhenry's trial panel hearing and review in this court, which occurred after the Rules of Professional Conduct replaced the former Code of Professional Responsibility. *Fitzhenry*, 343 Or at 88 n 1. Because the Bar charged only violations under the *former* Code of Professional Responsibility, Ellis argues that we should dismiss the allegations under this cause. Alternatively, Ellis argues that the Bar failed to prove that any former-client likely conflict of interest existed under *former* DR 5-105(C) because it failed to prove that the SEC and Bar matters were significantly related or that the interests of the various clients were adverse.[42]

B.   *Adoption of Oregon Rules of Professional Conduct in 2005 Narrowed Scope of Misconduct Alleged Under Tenth Cause*

We begin with Ellis's argument about the scope of the Bar's allegations under the former rules. We agree that *former* DR 5-105(C) did not apply to misconduct alleged to have occurred on or after January 1, 2005, the effective date for the Oregon Rules of Professional Conduct. *See In re*

---

[42] The Bar's complaint had alleged an "actual or likely" former-client conflict under this cause. The trial panel determined that the Bar did not prove that Ellis's representation of Fitzhenry in the Bar matter "was or was likely to be adverse to the objective interests of Samper and Daltry" in the DOJ investigation. On review, the Bar asserts the existence of a "conflict." Because the Bar's argument is limited to the question of adversity and does not mention any obligation on Ellis's part to contend for competing client positions, we analyze only whether a likely conflict of interest existed.

*Hartfield*, 349 Or 108, 115 n 4, 239 P3d 992 (2010) (although accused lawyer began representing client in 2003, before effective date of Rules of Professional Conduct, misconduct at issue occurred after that date, so new rules applied); *Hostetter*, 348 Or at 576 n 1 (alleged misconduct occurred both before and after January 1, 2005; former disciplinary rules applied to conduct alleged before the date, and new rules applied to conduct alleged on or after that date). We disagree, however, that the entirety of the tenth cause alleged misconduct occurring only after the effective date of the new rules.

The ninth cause against Ellis—which is not at issue here—alleged *current*-client conflicts between Fitzhenry, on the one hand, and Daltry and Samper on the other, arising from Ellis's representation of Fitzhenry in his Bar matter from July 2002 up to the issuance of this court's decision in *Fitzhenry*, 343 Or 86, in 2007. That cause included an allegation that, as part of Fitzhenry's defense, Ellis knowingly made representations on Fitzhenry's behalf that conflicted with the interests of former clients Daltry and Samper. The tenth cause realleged and incorporated by reference those same facts and then further alleged that (1) after late September 2002, the accuseds' representation of Daltry and Samper ended, but Ellis continued to represent Fitzhenry in the Bar matter; (2) from the formal prehearing phase through the appellate review proceedings—which all occurred after January 1, 2005—Ellis knowingly made representations on Fitzhenry's behalf that conflicted his former clients' interests; and (3) throughout Ellis's continuing representation of Fitzhenry once Daltry and Samper became former clients, a former-client conflict existed. Collectively, those allegations in the tenth cause asserted continuing misconduct throughout the entirety of the Fitzhenry Bar representation once Daltry and Samper became former clients; the allegations were not limited to Ellis's work relating to the trial panel hearing and appellate review that occurred after January 1, 2005. We therefore must determine whether the Bar proved by clear and convincing evidence that Ellis's representation of Fitzhenry in the Bar matter before that date posed a likely conflict of interest with former clients Daltry and Samper under *former* DR 5-105(C).

C. *No Former-Client Likely Conflict of Interest During Fitzhenry Bar Matter*

The central facts predating January 1, 2005, are as follows. In late November 2002, at Fitzhenry's request, Ellis wrote to the Bar, sending Fitzhenry's SEC settlement order and reiterating Fitzhenry's position that he had relied on FLIR's CEO (Stringer) and CFO (Samper) in signing the 1999 management representation letter. Ellis wrote the Bar again in December 2002, responding to a Bar inquiry and sending additional materials, including Fitzhenry's Wells Submission and SEC interview transcripts; that letter reiterated that Fitzhenry had intended to confirm only the legal representations in the 1999 management representation letter and inferred that he had relied on Samper and others as to the accounting representations. That second letter to the Bar also stated that, before signing the 1999 management representation letter, Fitzhenry specifically had confirmed with Samper that the information in the letter was accurate. At the time that Ellis sent those letters, the SEC settlements had been finalized, and Ellis had no knowledge of any pending DOJ investigation.

*Former* DR 5-105(C) prohibited representation of a new client "in the same or a significantly related matter" when the interests of the new client and a former client "are in actual or likely conflict," unless consent is obtained after full disclosure. As to the first requirement, a matter is "significantly related" if representation of the new client "would, or would likely, inflict injury or damage upon the former client in connection with any proceeding, claim, controversy, \*\*\* investigation, charge, accusation, \*\*\* or other particular matter in which the lawyer previously represented the former client[.]" *Former* DR 5-105(C)(1).[43] As to the second requirement, as discussed earlier, *former* DR 5-105(A)(2) defined a likely conflict as a situation in which

---

[43] The quoted definition refers to a "matter-specific" conflict. *Hostetter*, 348 Or at 586. *Former* DR 5-105(C)(2) alternatively defined a "significantly related matter" in terms of being "information-specific," that is, that the former client representation provided the lawyer with confidences or secrets, the use of which "would, or would likely, inflict injury or damage upon the former client in the course of the subsequent matter." *See Hostetter*, 348 Or at 586 (so identifying that type of conflict). Here, the Bar argues only that a matter-specific conflict existed.

the current and former clients' objective personal, business, or property interests "are adverse."[44] Here, the Bar asserts that it satisfied the "same or significantly related matter" requirement because the Fitzhenry Bar matter arose out of the same facts and circumstances as those at issue in the SEC proceeding, regarding the 1999 management representation letter. Ellis disagrees that the Bar satisfied either the "same or significantly related matter" requirement or the separate "adversity" requirement.

We agree with Ellis that the Bar did not prove by clear and convincing evidence that the "significantly related matter" requirement of *former* DR 5-105(C)(1) was satisfied and, therefore, did not prove that the former-client conflicts prohibition set out in *former* DR 5-105(C) applied to Ellis's representation of Fitzhenry in the Bar matter. On that point, the question is not whether Fitzhenry's Bar matter involved many of the same facts as the SEC investigation; it indisputably did. Rather, the question is whether Ellis's representation of Fitzhenry in the Bar matter would or would likely have inflicted injury or damage on Daltry's or Samper's *interests in connection with the SEC investigation.* *See Hostetter*, 348 Or at 588 ("significantly related" requirement focuses on injury or damage to former client's *interests* in connection with earlier representation, not injury to former client in abstract sense).

Three factors prompt us to conclude that no such likelihood existed here. First, at the time when Ellis wrote his letters to the Bar on Fitzhenry's behalf, the SEC investigation had ended, and Samper's settlement and the SEC's judgment against him—which had incorporated Samper's execution of a Consent to Entry of Judgment that included SEC findings of fraud—had been entered; Daltry, meanwhile, had no need to settle with the SEC, because he had not been the subject of a civil enforcement action. Nothing in the record supports a determination that Ellis's representation of Fitzhenry in the Bar matter—which concerned

---

[44] We note that *former* DR 5-105(C) particularly frames the former-client conflict inquiry in terms of whether "the *interests* of the current and former clients *are in actual or likely conflict*" (emphasis added), whereas *former* DR 5-105(A)(2) served to define a "likely conflict of interest" in terms of a scenario in which the objective interests of the clients "are adverse."

solely a professional licensing consequence for Fitzhenry, relating to his conduct as FLIR's General Counsel, and had no implications for either Samper or Daltry—would or would likely have inflicted injury or damage on those former clients in connection with an SEC investigation that had ended. Second, Ellis's letters to the Bar asserted a general position on Fitzhenry's behalf that was consistent with Samper's own SEC testimony, in that Samper had acknowledged to the SEC that he as CFO had been responsible for FLIR's accounting; that position therefore was not likely to inflict on Samper any injury or damage in connection with the SEC proceeding in any event. And third, Kaner testified that it was customary and expected for General Counsel such as Fitzhenry to rely on the representations of others—including the CFO—in signing management representation letters and that Kaner never had concluded that Ellis's representation of Fitzhenry in the Bar matter had inflicted any injury on Samper's interests. No countering evidence in the record persuades us that Ellis's representation of Fitzhenry in his Bar matter would or would likely have inflicted injury or damage on either Samper's or Daltry's interests in connection with the SEC investigation. It follows that, because Fitzhenry's Bar matter did not involve "the same or significantly related matter" as defined in *former* DR 5-105(C)(1), the trial panel correctly determined that no former-client likely conflict of interest existed under *former* DR 5-105(C).

## VI.  TENTH AND TWELFTH CAUSES—*FORMER* DR 5-105(C) AND *FORMER* DR 1-102(A)(3), FORMER-CLIENT LIKELY CONFLICTS AND MISREPRESENTATION BY OMISSION DURING DOJ REPRESENTATION

### A.  *Former-Client Likely Conflicts of Interest*

#### 1.  *Additional Facts*

The Bar's tenth (Rosenbaum) and twelfth (Ellis) causes alleged conflicts between FLIR on the one hand, and Daltry and Samper on the other, during the DOJ investigation. To more fully understand the parties' arguments and the trial panel's decision under those causes, we first provide a more detailed summary of the underlying facts.

Shortly after learning about the DOJ investigation, the accuseds met with Assistant United States Attorney Garten on January 30, 2003. Garten told the accuseds that he did not intend to target FLIR; he also gave them a DOJ memorandum that, among other things, noted that company cooperation with the DOJ was one of many factors for the DOJ to consider in deciding whether to seek corporate fraud charges. The accuseds had told Glade, Kaner, and Neil about the meeting beforehand; the day after the meeting, the accuseds relayed the meeting discussion to Kaner, and Rosenbaum faxed the DOJ memorandum to Kaner. The accuseds attempted to contact Daltry but were unable to reach him until late February.

The DOJ began requesting FLIR documents immediately. On January 31, 2003, at FLIR's direction, Stoel Rives sent to the FBI redacted documentation relating to the 2000 FLIR special committee investigation, which previously had been provided to the SEC. Stoel Rives sent a second group of related documents two weeks later that contained the redacted material, which—consistently with Wynne's testimony in the SEC investigation—had characterized FLIR's accounting errors as involving some competence issues on Samper's part, but not fraud.

On February 4, 2003, Garten and Rosenbaum met by phone. Garten identified Stringer, Samper, Eagleburger, and Martin as potential criminal defendants. Rosenbaum relayed that conversation to Glade and Kaner. The following week, in a meeting involving Garten, Ellis, Wynne, and Lewis, Lewis told Garten that FLIR would cooperate with the criminal investigation. In addition to FLIR's cooperation, however, Garten wanted the accuseds to help him develop evidence against individual potential defendants. Afterwards, Ellis told Wynne and Lewis that Stoel Rives ethically could not cooperate in the manner that Garten had requested.

On February 14, 2003, Garten wrote to the accuseds, requesting that FLIR provide its annual reports, certain SEC filings, bank documents, and compensation history for certain individuals, and also requesting that FLIR coordinate DOJ interviews of current and former FLIR personnel.

Garten's letter also stated, consistently with the DOJ memorandum, that the DOJ's "assessment of the extent of [FLIR's] cooperation will be a function, in part, of how proactive [the accuseds] are in assisting us with our proof against the former employees identified in the SEC complaint."[45] That part of the letter distressed both accuseds, because they understood it to expressly request their personal assistance in developing a criminal case against former clients. They theorized that Garten's request ultimately might harm Garten's position because, if such a course were pursued, the federal prosecution could be tainted due to attorney-client privilege and fiduciary obligation violations. Rosenbaum wrote to Garten, stating that the accuseds' earlier client representations limited their potential actions in the DOJ investigation. The accuseds did not send a copy of either Garten's letter or Rosenbaum's response to Daltry, Samper, Glade, or Kaner, because they did not intend to assist in the manner requested, although they did send Garten's letter to FLIR and began collecting the requested documentation.

The accuseds met with Garten on February 19, 2003. Garten now acknowledged that the accuseds' earlier representations limited their ability to cooperate. Garten also stated that he might not pursue a case against Daltry or Fitzhenry if they cooperated, but the same was not true for Samper. He also stated that Stringer, Martin, Samper, Fitzhenry, and Eagleburger all would need lawyers, although

---

[45] Garten's February 14, 2003, letter further stated that, "[i]n this case, [FLIR] seeks immunity from prosecution." At the trial panel hearing, however, the accuseds introduced an April 2011 declaration from Garten clarifying that that statement was meant to express Garten's understanding from Wynne that FLIR had been willing at the outset to cooperate with the criminal investigation. Garten's declaration also stated that, to the best of his recollection, the issue of FLIR seeking immunity never arose and was not discussed either formally or informally.

We note that, generally speaking, an immunity or nonprosecution agreement involves a promise that the defendant will be immune from prosecution "in exchange for providing information or otherwise assisting the government." Nancy Hollander, Barbara E. Bergman, and Melissa Stephenson, 1 *Wharton's Criminal Procedure* § 1:8 n 1 (14th ed 2010). Such an arrangement is not the same as a decision on the prosecution's part not to prosecute a particular potential defendant; instead, the former requires a meeting of the minds between the parties. *Cf. United States v. Wilson*, 392 F3d 1055, 1059-60 (9th Cir 2004) (contract principles apply to claimed immunity agreements, including requirement that prosecution objectively offered or promised immunity in exchange for some consideration).

he did not yet know about Daltry. In discussing what FLIR could tell its customers, Garten stated that they could be told that the DOJ was focusing on individuals involved in the 1998 and 1999 accounting issues, and that FLIR had been assured that—provided that it cooperated—it would not be subject to criminal prosecution. Neither accused understood that statement to mean that FLIR effectively had promised cooperation in exchange for immunity from prosecution; instead, they understood it to be a direction from Garten about what customers could be told.[46] Garten sent the accuseds a confirming e-mail later that day, essentially stating that he was abandoning his request for their personal cooperation because upcoming witness interviews might implicate their former clients Daltry, Samper, and Eagleburger. His e-mail also requested the accuseds' assistance in scheduling witness interviews and reiterated his earlier document production request. Thereafter, the accuseds had no direct contact with Garten or any involvement in the criminal case other than document production and witness scheduling. Rosenbaum told Glade about their meeting with Garten that same day. Also on that date, Stoel Rives sent a third group of documents to the DOJ, consisting of pleadings from the public record in the class action litigation.

The next day, Rosenbaum wrote to Glade, confirming that FLIR was not a DOJ target and that Samper and others, including Daltry, Fitzhenry, and Eagleburger, might need criminal lawyers. The letter also stated that the accuseds expected to continue to assist FLIR with document production and to make witnesses available for interviews. Rosenbaum sent a similar letter to Eagleburger's lawyer, Neil, the next day. The record contains no indication that Glade, Kaner, or Neil objected to the accuseds' ongoing document production and assistance with witness scheduling.

The following day, Stoel Rives provided Muessle's evaluation documentation to the DOJ (previously provided to the SEC), as well as hundreds of other documents, which appear to have consisted entirely of public FLIR securities filings. And, a few days later, Rosenbaum sent Garten the

---

[46] As noted above, Garten's April 2011 declaration similarly confirmed that Garten had no understanding in 2003 that the DOJ had discussed any formal or informal immunity arrangement for FLIR.

requested compensation data for Daltry and Fitzhenry, obtained from certain public FLIR filings. At some point, after coordinating with Rosenbaum, Muessle also sent Garten the requested compensation data for Samper, which Muessle had separately compiled. It appears from the record that, although the compensation data for certain directors and officers other than Samper had been publicly available, none of the compensation information transmitted to Garten previously had been produced to the SEC by FLIR. The record also shows, however, that Glade and Kaner previously had submitted Samper's compensation information to the SEC in response to a subpoena directed to Samper.

Meanwhile, Rosenbaum had been trying for several weeks to reach Daltry. Rosenbaum and Daltry spoke on February 24, 2003, and she recommended that he retain criminal defense counsel. Daltry immediately retained Myers, and Rosenbaum then told Myers that Garten was requesting FLIR documents from the dates pertaining to the SEC investigation, that some documents were beyond the scope of the SEC investigation,[47] that Garten did not intend to charge FLIR, and that Garten was inclined to give Daltry immunity if he cooperated. The next day, Ellis reiterated to Myers that Garten had asked FLIR to produce documents, and Myers understood that the documents were being produced accordingly. Myers did not object to the document production.

In late February 2003, Wynne met separately with Garten, in part to reiterate FLIR's intent to cooperate. Afterwards, Wynne proposed to the accuseds that FLIR retain separate counsel as to the DOJ investigation but that the accuseds continue to serve as FLIR's document depository and to schedule witnesses. In proposing that limited representation, which Garten had approved, Wynne reasoned that the accuseds were the most familiar with all the pertinent documentation and witness contact information, and that FLIR could leverage Stoel Rives's extensive prior cataloging of FLIR's documents—as well as its FLIR document database—relating to the SEC investigation, thereby

---

[47] Myers testified that, although he could not specifically recall, Rosenbaum also may have told him that requested documents already had been provided to the DOJ.

significantly reducing the cost to FLIR and ensuring a more timely and efficient response to the DOJ.

The accuseds asked a partner and in-house ethics expert whether Wynne's request for limited representation required consent from their former clients. The three determined that consent was unnecessary because the arrangement did not involve any conflict of interest that must be disclosed, but the partner nonetheless suggested that the accuseds seek consent. Rosenbaum drafted a disclosure and consent letter, incorporating some input from the partner; Ellis also reviewed and approved the letter.

Rosenbaum sent the disclosure letter, dated March 3, 2003, to FLIR and to Daltry, Samper, and Eagleburger, in care of their individual counsel and also Samper's separately retained criminal defense counsel. The letter explained:

- FLIR had been told that it was not the DOJ's focus and did not expect to be a defendant, and it had waived its attorney-client privilege with Stoel Rives for an identified time period;

- Stoel Rives had been asked to advise FLIR, which was cooperating with the DOJ investigation, and to assist FLIR in producing documents and arranging for witnesses to be interviewed;

- The criminal investigation related to the accuseds' earlier representations of Daltry, Samper, and Eagleburger, and had potentially adverse consequences to them;

- The accuseds had informed FLIR and the DOJ that Stoel Rives could cooperate only to the extent consistent with obligations arising from their past representations;

- The accuseds had met with an Assistant United States Attorney but did not intend to have further contact, other than facilitating document production and interview scheduling;

- The accuseds would not voluntarily disclose client confidences or affirmatively assist the DOJ in developing its case;

- Stoel Rives would not voluntarily produce information or materials arguably subject to claims of confidentiality, and Stoel Rives would inform the recipient's counsel of any DOJ request for such materials so that counsel could object if desired;

- In deciding whether to consent, the recipients should consider how the accuseds' representation of FLIR respecting the DOJ investigation would affect them;

- In the accuseds' assessment, the risk to the recipients from their limited representation of FLIR was "very small"; and

- Each recipient each should "review these matters carefully and for yourself" and seek advice from independent counsel to assist in determining whether to consent to the limited representation.

Daltry consented after consulting with Myers, conditioned on Myers's understanding that the accuseds would only produce documents and arrange interviews.[48] Eagleburger also consented, and Samper consented after consulting counsel, although six weeks elapsed between the date of Rosenbaum's letter and receipt of Samper's returned letter, signed by Samper and confirmed by Glade. In confirming Samper's consent, Glade further confirmed his understanding that Stoel Rives already was producing documents to the DOJ. In the meantime, the accuseds arranged for further witness interviews and produced more documents. For its part, FLIR retained other counsel to represent it in other aspects of the DOJ investigation—specifically, FLIR's ongoing cooperation therewith.

2. *Trial Panel Decision and Parties' Contentions*

In the ninth (Rosenbaum) and eleventh (Ellis) causes, the complaints alleged violations of *former* DR 5-105(E)

---

[48] Myers expressly had conditioned Daltry's consent because he wanted to confirm that the representation would be narrow, limited to document production and witness scheduling only. In that regard, the Bar raises issues on review about the note in Rosenbaum's letter that the accuseds would be "advising" FLIR. On review of the record as a whole, however, we find that the accuseds' limited representation of FLIR during the DOJ investigation was intended to—and did—extend to document production and witness scheduling only.

(current-client conflicts), arising from the accuseds' limited representation of FLIR during the DOJ investigation. The complaints alternatively alleged, in the tenth (Rosenbaum) and twelfth (Ellis) causes, that the same conduct violated *former* DR 5-105(C) (former-client conflicts). Specifically, the complaints alleged that FLIR's interests at that time conflicted with the interests of current or former clients Daltry and Samper, and that Rosenbaum's March 3, 2003, letter insufficiently disclosed the nature of those conflicting interests in seeking consent to the limited representation.[49]

The trial panel addressed the identified conflict allegations primarily under *former* DR 5-105(E) (current clients), as set out in the ninth and eleventh causes. The panel did not determine whether "actual," as opposed to "likely," conflicts existed and instead identified the question as whether "an actual or likely conflict" existed that required full disclosure under *former* DR 10-101(B). The panel ultimately determined that the accuseds had not made full disclosure to Daltry and Samper in Rosenbaum's March 3, 2003, letter so as to obtain those former clients' informed consent to the accuseds' representation of FLIR in the DOJ investigation. The panel expressly identified certain information that—in its view—the accuseds should have disclosed; we discuss that determination in greater detail later in this opinion. In the panel's view, the accuseds' failure to disclose the identified information violated *former* DR 5-105(E) (current-client likely conflicts, insufficient disclosure). The panel similarly and briefly determined that the Bar also had proved the alternatively alleged tenth and twelfth causes under *former* DR 5-105(C) (former-client conflicts).

On review, the accuseds first argue that the trial panel erroneously concluded that they should have disclosed certain information that the Bar did not identify in its complaints. Otherwise, the accuseds argue that—given the limited nature of their representation of FLIR during the DOJ investigation—no conflict of interest existed that required any disclosure and, alternatively, even if a conflict

---

[49] All those same causes further alleged that Rosenbaum's letter violated *former* DR 1-102(A)(3) (misrepresentation by omission), which we briefly discuss in the next section of the opinion.

did exist, their disclosure in Rosenbaum's March 3, 2003, letter was sufficient. For its part, the Bar agrees with the panel about the insufficient disclosure; it also more fully argues why the accuseds' limited representation of FLIR triggered the former-client likely conflict prohibition in *former* DR 5-105(C) as to Daltry and Samper, as alleged in the tenth and twelfth causes. (The Bar raises no current-client conflict allegations on review.)

3. *Assessment of Former-Client Likely Conflict Arising From Limited Representation During DOJ Investigation*

We begin with the threshold question whether *former* DR 5-105(C) applied to the accuseds' limited representation of FLIR in the DOJ investigation, so as to trigger the "full disclosure" and consent requirements of *former* DR 5-105(D) and *former* DR 10-101(B).[50] As explained earlier, among other things, *former* DR 5-105(C) prohibits a lawyer who previously represented a former client from representing a new client when (1) the new representation involves a "significantly related matter;" and (2) the current and former clients' interests are in likely conflict. Here, the accuseds do not dispute that their limited representation of FLIR in the DOJ investigation likely satisfied the "significantly related matter" requirement; indeed, their March 3, 2003, letter acknowledged as much.[51] Instead, they argue that the Bar did not satisfy the second requirement—that is, the Bar did not show that the interests of FLIR and former clients Daltry and Samper were in likely conflict at the outset of the limited representation. As to that question, the Bar was required to prove that the objective personal, business, or property interests of FLIR, on the one hand, and Daltry and Samper on the other, were adverse at the time in question. *Former* DR 5-105(A)(2).

[50] As the accuseds note on review, the trial panel did not make any express finding about the existence of a prohibited former-client conflict under *former* DR 5-105(C). Instead, the panel focused on the accuseds' March 3, 2003, disclosure letter and determined that the accuseds had violated *former* DR 5-105(C) because the consent that they obtained under *former* DR 5-105(D), which permitted the representation, was invalid due to lack of full disclosure.

[51] We accept the accuseds' concession and do not separately analyze whether the Bar satisfied the "significantly related matter" requirement under *former* DR 5-105(C).

In the context of assessing whether a former-client likely conflict exists under *former* DR 5-105(C), this court has set out the following analysis. First, a lawyer faced with a potential conflict must assess "the former client's interests *that pertain to the matter in which the lawyer previously represented the former client*." *Hostetter*, 348 Or at 584 (emphasis added). After identifying the former clients' interests as described, the lawyer must determine whether—at the time of seeking to undertake the new representation—the former client's interests "are adverse to the current client during the subsequent representation." *Id.* at 594. That is, the question is not whether the former client has a current, independent interest that is adverse to the current client's interest in the new representation; instead, the question is whether the former client's interest *in relation to the earlier representation* is adverse to the current client's interest in the new representation.

This court's case law illustrates application of that framework. For example, in *Hostetter*, 348 Or 574, the accused lawyer had drafted loan documents for a former client. The former client later died, and the lawyer then represented the lender in a claim against the former client's estate. *Id.* at 577. The central question as to adversity was whether the former client's "interest" had survived her death, so as to establish a likely conflict under *former* DR 5-105(C). *Id.* at 581-82. After determining that the former client's interest did survive, the court identified her interest in the earlier representation as being one of a debtor, with an interest in minimizing her legal debt to the extent legally possible and reasonable. By contrast, the lender's interest in the new representation was to collect as much as possible from the estate. *Id.* at 593. By their nature, those interests were "different" and "adverse," and therefore amounted to a likely conflict of interest. *Id.*

Similarly, in *In re Brandsness*, 299 Or 420, 702 P2d 1098 (1985), the lawyer previously had represented a husband and wife in a business venture and also had drafted their wills. After both the venture and the marriage soured, the wife rewrote her will with the assistance of a different lawyer and also hired her own business lawyer. The husband

subsequently asked the original lawyer to represent him in a dissolution proceeding, in which the use and division of assets and liabilities from the business were at issue. *Id.* at 422-23. The court assessed the wife's interest in the context of the earlier business representation and determined that the dissolution proceeding—in which the necessary "focal point" had been the couple's business—"created an adverse relationship" between the former and present clients. *Id.* at 429; s*ee also Cobb*, 345 Or at 133-34 (investor clients' interests not adverse to principal company's interest at point in time when all parties sought to dismiss underlying bankruptcy proceeding to protect certain assets in which all shared an interest; interests diverged later, when it became clear that investors—now former clients—would become company's creditors in bankruptcy).

Applying that framework to the Bar's allegations here, we begin by identifying the interests of the accuseds' former clients Daltry and Samper in relation to the accuseds' earlier representation of them during the SEC investigation. Daltry's and Samper's most pressing interests during the SEC investigation had been to avoid individual process violations, to avoid individual SEC civil enforcement actions, and—as to Samper once the SEC filed an enforcement action against him—to mitigate the potential negative results of that action. Daltry and Samper also shared an interest in having the accuseds protect their client confidences obtained during the course of the earlier representation. Additionally, Daltry and Samper had an interest during the course of the SEC investigation to minimize other potential negative consequences that might flow to them as a result of the investigation.

Next, we identify the interest of FLIR in the new, limited representation in the DOJ investigation. As noted, Garten told the accuseds at the outset that he did not intend to target FLIR but instead was focused on potential charges against several individuals, including Samper and perhaps Daltry. In general, then, FLIR's role at the outset of that representation was to serve as a potential governmental witness in a criminal investigation. In the context of the accuseds' agreed-upon limited representation, however,

FLIR's interest was narrow: Essentially, FLIR had an interest in demonstrating its willingness to cooperate with the DOJ investigation by responding quickly and accurately to documentation requests and efficiently assisting with scheduling witness interviews. Relatedly, FLIR had an interest in controlling its cost of cooperating by having lawyers familiar with FLIR's extensive SEC documentation and Stoel Rives's FLIR document database facilitate the DOJ document production.[52]

Having identified the client interests involved, we now discuss whether those interests were adverse when the accuseds agreed to undertake the limited representation of FLIR during the DOJ investigation. On one hand—unlike the factual scenarios in *Hostetter* and *Brandsness*—Daltry's and Samper's self-protective interests in relation to the earlier representation effectively had ended, because the new representation commenced after the SEC proceeding had ended and the ensuing judgments entered, thereby resolving Daltry's and Samper's interests in avoiding process violation charges and SEC enforcement actions. And, nothing about FLIR's narrow interest in cooperating with DOJ document requests and witness interview scheduling, or in controlling its costs, was adverse to those particular interests of Daltry and Samper in the earlier SEC representation.[53]

The same cannot necessarily be said, however, as to Daltry's and Samper's interests during the SEC investigation

---

[52] As part of identifying the client interests at stake, the Bar thinks it significant that FLIR had secured some sort of immunity arrangement—even if informal—with the DOJ, such that the DOJ would not prosecute FLIR so long as it cooperated in the investigation. The Bar did not prove by clear and convincing evidence, however, that any such arrangement was made. *See* 356 Or at ___ n 45 (noting requirements for immunity or nonprosecution agreement). Indeed, the evidence shows that Garten had told FLIR at the outset that it was not a target, and Garten later attested that no formal or informal immunity arrangement had been discussed. *See id.* (discussing contents of Garten declaration about nature of discussions with FLIR).

[53] As noted, Daltry and Samper also each had an interest in protecting previously disclosed client confidences, which continued to exist at the time of the accuseds' limited representation of FLIR. The Bar did not prove, however, that any aspect of that personal interest was adverse to FLIR's interest in the context of the accuseds' new limited representation of FLIR. Indeed, the accuseds expressly told the former clients in Rosenbaum's March 3, 2003, letter that under no circumstances would the limited representation involve voluntary disclosure of former client confidences.

in mitigating against generally negative outcomes, such as the future criminal investigation that materialized later based on the same general facts. That particular interest arguably continued even after the accuseds' SEC representation of Daltry and Samper had ended, and it arguably was inconsistent with FLIR's interest in demonstrating cooperation with the DOJ through efficient and responsive document production and witness scheduling.[54]

Ultimately, it is a close question whether, at the outset, the interests of Daltry and Samper identified above were adverse to FLIR's—particularly in the context of the accuseds' limited representation of FLIR. After reviewing the record and considering the remainder of the parties' arguments, we assume without deciding that the Bar proved an adversity of interests and, therefore, a likely conflict, under *former* DR 5-105(C). We make that assumption because, as explained below, our resolution of the Bar's allegations about the accuseds' disclosure of the purported conflict—so as to obtain their former clients' consent to their limited representation of FLIR—resolves these causes in the accuseds' favor.[55]

---

[54] In making that observation, we reiterate that the key inquiry under this cause is whether the client's respective interests as described above were adverse, therefore presenting a likely conflict, at the *outset* of the DOJ investigation. The Bar in large part focuses on Samper's interests *during* the DOJ investigation; for example, it relies on multiple purported facts that arose during that investigation—all occurring after the date of any fact alleged in the complaints—that purport to show that the accuseds' ongoing representation of FLIR in fact harmed Samper in the DOJ proceeding and therefore must have been adverse to him.

As explained earlier, however, *former* DR 5-105(C) has two components: a determination whether the new representation involves "the same or a significantly related matter"; and a determination whether the interests were adverse so as to show a likely conflict. The Bar's argument about injury or harm to Samper during the DOJ investigation certainly might pertain to the first requirement (which, as noted, the accuseds concede was satisfied here for other reasons), but does not pertain to the second. *See former* DR 5-105(C)(1) (defining "significantly related" matter as scenario in which new representation would or would likely inflict injury or damage on former client in connection with earlier representation); *Hostetter*, 348 Or at 594 (cautioning against conflating "adversity" with "injury" for purposes of adversity requirement).

[55] The Bar also argues that the accuseds cannot rely on their characterization of their representation of FLIR as a "ministerial role" so as to be exempt from the disciplinary rules. The accuseds do not argue, however, that their limited representation rendered them exempt from the rules; instead, they argue that the nature of their limited representation narrowed the scope of their client FLIR's interests in the DOJ investigation for purposes of applying the "likely conflict" requirement of *former* DR 5-105(C).

#### 4. *Sufficient Disclosure of Former-Client Likely Conflict, so as to Obtain Client Consent*

As described earlier, the trial panel identified certain information that it determined that the accuseds should have disclosed in Rosenbaum's March 3, 2003, letter to Daltry and Samper, so as to satisfy the full disclosure requirements of *former* DR 10-101(B). That information included (1) a copy of Garten's February 14, 2003, letter requesting the accuseds' personal cooperation with the investigation; (2) the fact that Ellis was representing Fitzhenry in the latter's Bar matter; (3) the fact that Garten had requested, and the accuseds had produced, officer compensation information for Daltry and Samper; and (4) the fact of an SEC investigation—purportedly with the accuseds' assistance—of transactions previously not alleged, specifically involving Rosenbaum's October 2002 phone inquiry about the Swedish Drop Shipment. The accuseds challenge the panel's determinations in two respects. First, they argue that the Bar's complaints did not allege that they had been obligated to disclose most of the information that the panel identified and that they therefore had no notice as to those allegations. Alternatively, the accuseds argue that they satisfied all full-disclosure requirements. The Bar responds that the panel correctly determined that Rosenbaum's March 3, 2003, letter did not provide full disclosure to sufficiently permit the accuseds' former clients to consent to the accuseds' limited representation of FLIR during the DOJ investigation.

We first briefly address the accuseds' contentions that the complaints did not allege that they were required to disclose to former clients Daltry and Samper most of the information that the trial panel determined should have been disclosed. We agree with the accuseds that the complaints did not allege that they should have provided Daltry and Samper with a copy of Garten's February 14, 2003,

---

As a general matter, limited representation of a client is permitted, *see generally Cobb*, 345 Or at 111 (recognizing lawyer's representation of individual investors for "specific limited purposes," contrasted against serving as general business counsel), and the record demonstrates that, after the accuseds agreed to undertake the limited representation of FLIR, they accordingly limited their involvement to document production and scheduling witness interviews.

letter, and that they therefore had no notice of that specific purported misconduct. *See* 356 Or at ____ (describing notice requirements in Bar proceedings). The complaints did, however, allege that the accuseds should have disclosed to Daltry and Samper "the nature or extent of Garten's demands for FLIR's cooperation in the criminal case," as reflected in his February 14, 2003, letter. Given the relationship between that allegation and the panel's determination that the accuseds should have provided Garten's letter to Daltry and Samper, we think that the panel's determination essentially amounted to a determination that the Bar had proved its allegation about lack of disclosure respecting the nature and extent of Garten's demands. The Bar therefore has sufficiently raised that question, as stated in its complaints, on review.

As to Ellis's representation of Fitzhenry in his Bar matter, the accuseds emphasize that the trial panel commented—in relation under the tenth and twelfth causes—that Ellis should have *obtained consent* to that new representation of *Fitzhenry*. The panel's opinion does make that observation; however, it also states that the accuseds should have *disclosed* in Rosenbaum's March 3, 2003, letter to Daltry and Samper the fact that Ellis was representing Fitzhenry in the Bar matter arising from related facts, so that Daltry and Samper had sufficient information to consent to the accuseds' limited representation of FLIR. The complaints contained that same disclosure allegation, and it therefore is properly before us on review.

As to the trial panel's determination that FLIR had been asked to produce, and already had produced, compensation information for Daltry and Samper, the accuseds are correct that the tenth and twelfth causes did not allege that they were required to disclose that specific information. The complaints did, however, allege more generally that the accuseds should have disclosed that they already had produced FLIR documents to the FBI. The panel's more specific determinations fell within that general allegation, which is properly before us on review. We proceed to consider whether Rosenbaum's March 3, 2003, letter satisfied the accuseds' full disclosure obligations.

Under *former* DR 10-101(B)(1), "'Full disclosure' means an explanation sufficient to apprise the recipient of the potential adverse impact on the recipient, of the matter to which the recipient is asked to consent." This court has explained that that rule requires an explanation providing sufficient detail to permit the recipient to understand why it may be desirable to obtain independent counsel. *In re Boivin*, 271 Or 419, 424, 533 P2d 171 (1975). Generally, such an explanation must show the nature of the likely conflict and apprise the client of the potential adverse consequences of that conflict. *In re Brandt/Griffin*, 331 Or 113, 137, 10 P3d 906 (2000). In *Brandt/Griffin*, for example, the accused lawyers sent a disclosure letter to a former client that contained certain facts, but this court determined that the facts provided suggested that no conflict existed, whereas additional facts—had they been disclosed—would have shown the true divergence of the respective clients' interests and explained both the nature of the conflict and the adverse consequences that might flow to the client being asked to provide consent. *Id.*

The requirement in *former* DR 10-101(B)(1) that sufficient facts be disclosed does not, however, extend to "all facts known to [the lawyer] that could be helpful to the former client." *Cobb*, 345 Or at 135. In *Cobb*, discussed earlier, the lawyer had represented some investor partnerships in a company and also an entity associated with the company in different aspects of complex bankruptcy proceedings, in which a trustee had been appointed to represent the bankruptcy estate for the entity. *Id.* at 110-13. After it later became apparent to the lawyer that he could not continue to represent all the clients, he filed a motion to withdraw accompanied by an affidavit disclosing certain facts. *Id.* at 113. The Bar contended that the affidavit should have disclosed that the investor partnerships had made certain payments to the lawyer and other related entities that instead should have been made to the entity in bankruptcy. This court disagreed, reasoning that the lawyer's affidavit sufficiently had notified the trustee "of the nature of the conflict, *i.e.*, that the interests of [the entity] and the investor partnerships could diverge and that he could not advocate for both." *Id.* at 135. The court further explained that, although

the trustee might have benefitted—for purposes of marshalling the entity's assets—had the lawyer disclosed the payment information at issue, "that [was] not information that the [lawyer] was required to disclose to comply with conflict of interest rules." *Id.*

*Cobb* also demonstrates that, although "compliance with the letter of the [disclosure] rule is required," the unique circumstances of a particular case may establish satisfaction of certain aspects of the rule. *Id.* at 135-36. There, at an earlier juncture in the case than the events described above, the creator of the entity in bankruptcy instructed the lawyer to withdraw, but the bankruptcy court wanted the lawyer continue as local counsel. The lawyer sent disclosure letters to all his clients, including to the creator and the creator's independent counsel; those letters did not formally advise the entity to seek the advice of independent counsel under *former* DR 10-101(B)(2). All clients consented. Later, when the lawyer realized that an actual conflict had arisen among his clients, he again sought to withdraw from representing the entity (which the bankruptcy court allowed), although he continued to represent the partnerships. *Id.* at 132-35. The Bar raised two arguments on review asserting insufficient disclosure, which, as discussed below, this court rejected.

First, the Bar argued that the lawyer's initial disclosure letter to the entity had been insufficient because it had failed to confirm in writing the lawyer's recommendation that the client seek independent legal advice. This court disagreed, reasoning that the lawyer had addressed his disclosure letter to not only the entity's creator but also to three of the creator's independent lawyers. When viewed in that context, the content of the letter—including facts that explained the potential conflict and its request for "advice and assistance in determining the appropriate role for [the lawyer] in these cases"—satisfied both the requirement and purpose of the "written recommendation to seek independent counsel advice" component of the disclosure rule, *former* DR 10-101(B)(2). *Id.* at 133.

Second, the Bar argued that, in the course of moving to withdraw from representing the entity, the lawyer should

have advised the entity in writing—through the bankruptcy trustee—to seek independent legal advice before consenting to the lawyer's withdrawal. Again, even after acknowledging that compliance with "the letter of the rule is required," *id.* at 135, this court disagreed. In doing so, the court emphasized the "unique" circumstances of the case, in which the court-appointed trustee—who was an experienced government lawyer (and who had not been a client of the lawyer or relied on his advice)—was the only person with authority to decide whether to consent on behalf of the entity. In those circumstances, the court determined that the lawyer had not been required to advise the trustee to seek outside legal advice on the entity's behalf before consenting to the lawyer's withdrawal. *Id.* at 136.

We now apply the foregoing principles to determine whether Rosenbaum's March 3, 2003, letter to Daltry and Samper satisfied the full disclosure requirements of *former* DR 10-101(B)(1). At the outset, we reiterate that the nature of the accuseds' limited representation of FLIR in the DOJ investigation consisted of only producing documents and scheduling witnesses. Thus, the "matter to which [Daltry and Samper were] asked to consent," *former* DR 10-101(B)(1), was *only* that limited representation. It follows that the accuseds were required to provide an explanation sufficient to both explain the nature of the conflict and to apprise Daltry and Samper of the potential adverse impact on them if the accuseds—on FLIR's behalf—located FLIR documents requested by the DOJ, reviewed them for privilege or confidentiality issues, transmitted them to the DOJ or the FBI, and scheduled witnesses for DOJ interviews. *See Brandt/ Griffin*, 331 Or at 136-37 (disclosed facts must show divergence of respective clients' interests and potential adverse consequences).

We conclude that Rosenbaum's March 3, 2003, letter complied with *former* DR 10-101(B)(1). By disclosing that the DOJ was investigating Samper and possibly Daltry in a matter "significantly related" to the SEC investigation that had potential adverse consequences to them,[56] but that

---

[56] Rosenbaum's letter explained the "significantly related matter" component of *former* DR 5-105(C) and stated that the DOJ investigation was a "related matter" for purposes of that rule.

FLIR did not expect to be a defendant and was cooperating with the investigation, the accuseds explained the divergence of interests between their current and former clients, as well as the nature of that conflict. By disclosing that they had been asked to assist FLIR in producing documents and arranging for witness interviews, the accuseds explained both the nature of the limited representation and the potential adverse consequences to Daltry and Samper: As a result of the representation, the accuseds would assist in producing FLIR documents that might help the DOJ build its case, which ultimately might subject Daltry or Samper to criminal prosecution and penalties.[57] Further, the letter explained that the accuseds had informed FLIR and the DOJ that they could cooperate only as consistent with their earlier representational obligations, that they would not voluntarily produce any information or materials arguably subject to confidentiality claims by Daltry or Samper, and that they would inform Daltry's and Samper's counsel of such requests so that counsel could object if desired. Finally, the letter recommended that Daltry and Samper seek the assistance of independent counsel to determine whether consent should be given, and the letter was separately sent to those clients' independent counsel. Collectively, those aspects of the letter satisfied the requirements of *former* DR 10-101(B).

As set out earlier, the trial panel determined that the accuseds should have disclosed four additional points of information, and the Bar—elaborating on the initial disclosure allegations in its complaints—urges us to affirm that determination on review. For the reasons explained below, we do not agree that the accuseds were required under *former* DR 10-101(B)(1) to disclose the additional information that the panel identified.

First, the complaints alleged that the accuseds should have disclosed "the nature or extent of Garten's

---

[57] Of course, as Myers acknowledged before the trial panel, FLIR itself would have been required to produce the documents to DOJ in any event, even if the accuseds had not been acting as its counsel for that purpose at that time. (The same is true for scheduling witness interviews.) It was the document production *itself*—not necessarily the accuseds' participation in the production—that most clearly had potential adverse consequences to the Daltry and Samper. As noted, the accuseds' limited representation ensured efficiency in both the document production and witness scheduling processes—a benefit that flowed to both FLIR and the DOJ, and reduced FLIR's (and likely the DOJ's) costs.

demands for FLIR's cooperation in the criminal case," apparently referring at least in part to Garten's initial request that the accuseds personally assist the DOJ. (As noted, the trial panel determined that the accuseds should have sent Garten's February 14, 2003, letter to Daltry and Samper.) As discussed earlier, however, Garten soon withdrew that request after further consideration. Disclosure of that request—withdrawn shortly after it was made—to Daltry and Samper was not necessary to apprise them of the nature of the conflicting client interests or the potential adverse impact on them flowing from the accuseds' limited representation of FLIR in the DOJ investigation.[58]

Second, the complaints alleged—and the trial panel determined—that the accuseds should have disclosed that Ellis was representing Fitzhenry in his Bar matter, arising from alleged misrepresentations made in the 1999 management representation letter. At the panel hearing, Myers briefly testified that his initial understanding in conversations with Ellis had been that Fitzhenry was perhaps a DOJ target to a lesser extent, and so he would have liked to have known at the time of the limited representation that Ellis also was representing Fitzhenry in the Bar matter. As explained earlier, however, *former* DR 10-101(B)(1) does not require a lawyer seeking client consent to disclose "all facts known to [the lawyer] that could be helpful to the former client." *Cobb*, 345 Or at 135. Instead, the rule requires an explanation sufficient to describe the nature of the conflict between the clients—here, FLIR on the one hand, and Daltry and Samper on the other—and the potential adverse consequences that could flow from the new representation. *See id.*; *Brandt/Griffin*, 331 Or at 137 (both so explaining). As already described, Rosenbaum's March 3, 2003, letter disclosed sufficient facts to apprise their former clients for purposes of obtaining consent; they were not required to further disclose Ellis's representation of Fitzhenry in his Bar matter—a proceeding with professional licensing

---

[58] The Bar also argues on review that Rosenbaum's March 3, 2003, letter to Daltry and Samper failed to fully disclose facts regarding FLIR's purported informal immunity arrangement with the DOJ—that is, to cooperate in exchange for avoiding prosecution. As noted earlier, however, *see* 356 Or at ____ n 45, ___ n 46, the facts in the record do not support the Bar's theory that any such arrangement in fact had been made.

implications for Fitzhenry alone, based on facts developed during the SEC investigation.

Third, the complaints alleged that the accuseds should have disclosed that they already had produced FLIR documents to the FBI (and, inferentially by extension, to the DOJ); in that regard, the trial panel determined that the accuseds should have disclosed to Daltry and Samper that the DOJ had requested, and the accuseds had produced, their compensation information. As the facts summarized earlier demonstrate, however, the accuseds already had told Daltry's and Samper's independent counsel (Glade, Kaner, and Myers)—before sending Rosenbaum's March 3, 2003, disclosure letter—that the DOJ was investigating Samper and perhaps Daltry, that the DOJ had requested FLIR documents, and that the accuseds were producing FLIR documents on request on FLIR's behalf. And, virtually all the documents produced in the timeframe that the Bar has identified were either part of the SEC proceeding or part of the public record.[59] Given those facts, we decline to conclude that the accuseds were required to disclose in Rosenbaum's March 3, 2003, letter the fact of the ongoing document production.

Fourth, the complaints alleged that Rosenbaum's March 3, 2003, letter should have disclosed that, with the accuseds' assistance, the SEC was investigating FLIR's accounting of transactions not previously alleged. As to those allegations, the trial panel determined that the accuseds should have disclosed that Rosenbaum had contacted the SEC in October 2002 to ask about the Swedish Drop Shipment, and the Bar seeks affirmance of that determination on review.[60] We conclude that the accuseds were

---

[59] As previously described, by March 3, 2003, the accuseds on FLIR's behalf had produced FLIR documents that previously had been provided to the SEC, public FLIR securities filings, and pleadings from the earlier class action litigation. The accuseds had produced one nonpublic document containing previously redacted material that had not been produced to the SEC, but that redacted material was consistent with Wynne's (and Samper's) assertions made throughout the SEC proceeding. As to the compensation information that the accuseds provided to the DOJ, Daltry's had been derived from public FLIR securities filings, and Samper's previously had been provided to the SEC by Glade and Kaner's law firm.

[60] The trial panel also stated that Rosenbaum had provided the SEC with documentation as to that transaction and also should have advised Daltry and

not obligated to disclose the fact of Rosenbaum's SEC phone call—to the extent that it arguably showed any "assistance" with an ongoing investigation as alleged in the complaints—to Daltry and Samper. As in *Cobb*, 345 Or at 135, and as with Ellis's representation of Fitzhenry in his Bar matter, discussed earlier, that information might have assisted Samper in developing his defense in the DOJ investigation. But its disclosure was not necessary under *former* DR 10-101(B)(1) to apprise him of the nature of his developing divergent interest and conflict with FLIR in the context of the limited representation, or to advise him of the potential adverse impact on him if he consented to the accuseds' representation of FLIR in a role limited to producing requested documentation and scheduling witness interviews.

In sum, we conclude that—assuming that a likely conflict of interest existed between the accuseds' current client FLIR and their former clients Daltry and Samper under *former* DR 5-105(C) at the time of their limited representation of FLIR in the DOJ investigation—Rosenbaum's March 3, 2003, letter to Daltry and Samper set out an explanation sufficient to apprise them of the nature of the conflict and the potential adverse impact flowing to them from the limited representation, so as to obtain their consent to the representation. The Bar has not proved by clear and convincing evidence that the accuseds violated *former* DR 5-105(C) or *former* DR 10-101(B).

## B.  *Misrepresentation by Omission*

The Bar also alleged in the tenth and twelfth causes that, in failing to make sufficient disclosures in Rosenbaum's March 3, 2003, letter, the accuseds engaged in misrepresentation by omission, because they knowingly failed to disclose facts that were material to former clients Daltry's and Samper's decisions whether to consent to the limited representation of FLIR during the DOJ investigation, in violation of *former* DR 1-102(A)(3). *See In re Gustafson*, 327 Or 636, 647, 968 P2d 367 (1998) (rule requires that lawyer knowingly engage in misrepresentation, including knowing

---

Samper of that fact, but the panel's earlier factual findings stated that FLIR—not Rosenbaum herself—had provided follow-up information to the SEC. The Bar limits its argument on review to Rosenbaum's phone call.

failure to disclose material fact that lawyer had in mind). Based on its decision that the accuseds insufficiently had disclosed identified facts about former-client likely conflicts so as to obtain consent under *former* DR 5-105(D) and *former* DR 10-101(B), the trial panel similarly concluded that the accuseds had violated *former* DR 1-102(A)(3). The accuseds challenge that conclusion on review; the Bar responds that the panel was correct.

In light of our conclusion that Rosenbaum's March 3, 2003, disclosure letter complied with *former* DR 10-101(B), we further conclude, without additional discussion, that the Bar did not prove by clear and convincing evidence that the accuseds engaged in misrepresentation by omission in violation of *former* DR 1-102(A)(3).

## VII.   CONCLUSION

On *de novo* review, we conclude that the Bar has not proved the allegations at issue on review by clear and convincing evidence, and we therefore dismiss those allegations. We otherwise uphold the trial panel's determinations that the Bar also did not prove the remaining allegations not at issue on review, and we therefore dismiss those allegations as well.

The amended complaints are dismissed.